# KIRKPATRICK, SECRETARY OF STATE OF MISSOURI, ET AL. *v.* PREISLER ET AL.

No. 30. Argued January 13, 1969.—
Decided April 7, 1969.*

---

*Together with No. 31, *Heinkel et al.* v. *Preisler et al.,* also on appeal from the same court.

*Thomas J. Downey,* First Assistant Attorney General of Missouri, argued the cause for appellants in No. 30. With him on the briefs were *Norman H. Anderson,* Attorney General, *pro se,* and *Louren R. Wood,* Assistant Attorney General. *David Collins* argued the cause and filed a brief for appellants in No. 31.

*Irving Achtenberg* argued the cause for appellees in both cases. With him on the brief was *Paul W. Preisler, pro se.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In *Wesberry* v. *Sanders,* 376 U. S. 1 (1964), we held that "[w]hile it may not be possible [for the States] to draw congressional districts with mathematical precision," *id.,* at 18, Art. I, § 2, of the Constitution requires that "as nearly as is practicable one man's vote in a con-

gressional election is to be worth as much as another's."
*Id.*, at 7–8. We are required in these cases to elucidate
the "as nearly as practicable" standard.

The Missouri congressional redistricting statute chal-
lenged in these cases resulted from that State's second
attempt at congressional redistricting since *Wesberry*
was decided. In 1965, a three-judge District Court for
the Western District of Missouri declared that the
Missouri congressional districting Act then in effect was
unconstitutional under *Wesberry* but withheld any judi-
cial relief "until the Legislature of the State of Missouri
has once more had an opportunity to deal with the prob-
lem . . . ." *Preisler* v. *Secretary of State of Missouri,*
238 F. Supp. 187, 191. Thereafter, the General As-
sembly of Missouri enacted a redistricting statute, but
this statute too was declared unconstitutional. The Dis-
trict Court, however, retained jurisdiction to review any
further plan that might be enacted. *Preisler* v. *Secretary
of State of Missouri,* 257 F. Supp. 953 (1966), aff'd, *sub
nom. Kirkpatrick* v. *Preisler,* 385 U. S. 450 (1967). In
1967, the General Assembly enacted the statute under
attack here, Mo. Rev. Stat., c. 128 (Cum. Supp. 1967),
and the Attorney General of Missouri moved in the
District Court for a declaration sustaining the Act and
an order dismissing the case.

Based on the best population data available to the
legislature in 1967, the 1960 United States census figures,
absolute population equality among Missouri's 10 con-
gressional districts would mean a population of 431,981 in
each district. The districts created by the 1967 Act, how-
ever, varied from this ideal within a range of 12,260
below it to 13,542 above it. The difference between the
least and most populous districts was thus 25,802. In
percentage terms, the most populous district was 3.13%

above the mathematical ideal, and the least populous was 2.84% below.[1]

The District Court found that the General Assembly had not in fact relied on the census figures but instead had based its plan on less accurate data. In addition, the District Court found that the General Assembly had rejected a redistricting plan submitted to it which provided for districts with smaller population variances among them. Finally, the District Court found that the simple device of switching some counties from one district to another would have produced a plan with markedly reduced variances among districts. Based on these findings, the District Court, one judge dissenting, held that the 1967 Act did not meet the constitutional standard of equal representation for equal numbers of people "as nearly as practicable," and that the State had failed to make any acceptable justification for the variances. 279 F. Supp. 952 (1967). We noted

---

[1] The redistricting effected by the 1967 Act, based on a population of 4,319,813 according to the 1960 census, is as follows:

| District No. | Population. | % Variation From Ideal. |
|---|---|---|
| One | 439,746 | + 1.80 |
| Two | 436,448 | + 1.03 |
| Three | 436,099 | + 0.95 |
| Four | 419,721 | − 2.84 |
| Five | 431,178 | − 0.19 |
| Six | 422,238 | − 2.26 |
| Seven | 436,769 | + 1.11 |
| Eight | 445,523 | + 3.13 |
| Nine | 428,223 | − 0.87 |
| Ten | 423,868 | − 1.88 |

Ideal population per district............................ 431,981
Average variation from ideal............................ 1.6%
Ratio of largest to smallest district..................... 1.06 to 1
Number of districts within 1.88% of ideal................ 7
Population difference between largest and smallest districts.. 25,802

probable jurisdiction but stayed the District Court's judgment pending appeal and expressly authorized the State "to conduct 1968 congressional elections under and pursuant to [the] 1967 . . . Act . . . ." 390 U. S. 939 (1968). We affirm.

Missouri's primary argument is that the population variances among the districts created by the 1967 Act are so small that they should be considered *de minimis* and for that reason to satisfy the "as nearly as practicable" limitation and not to require independent justification. Alternatively, Missouri argues that justification for the variances was established in the evidence: it is contended that the General Assembly provided for variances out of legitimate regard for such factors as the representation of distinct interest groups, the integrity of county lines, the compactness of districts, the population trends within the State, the high proportion of military personnel, college students, and other nonvoters in some districts, and the political realities of "legislative interplay."

## I.

We reject Missouri's argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy without question the "as nearly as practicable" standard. The whole thrust of the "as nearly as practicable" approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case. The extent to which equality may practicably be achieved may differ from State to State and from district to district. Since "equal representation for equal numbers of people [is] the fundamental goal for the House of Representatives," *Wesberry* v. *Sanders, supra,* at 18, the "as nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical

equality. See *Reynolds* v. *Sims,* 377 U. S. 533, 577 (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

There are other reasons for rejecting the *de minimis* approach. We can see no nonarbitrary way to pick a cutoff point at which population variances suddenly become *de minimis.* Moreover, to consider a certain range of variances *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable. The District Court found, for example, that at least one leading Missouri legislator deemed it proper to attempt to achieve a 2% level of variance rather than to seek population equality.

Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives. Toleration of even small deviations detracts from these purposes. Therefore, the command of Art. I, § 2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown.

Clearly, the population variances among the Missouri congressional districts were not unavoidable. Indeed, it is not seriously contended that the Missouri Legislature came as close to equality as it might have come. The District Court found that, to the contrary, in the two reapportionment efforts of the Missouri Legislature since *Wesberry* "the leadership of both political parties in the Senate and the House were given nothing better to work with than a makeshift bill produced by what has been candidly recognized to be no more than . . . an expedient political compromise." 279 F. Supp., at 966. Legisla-

tive proponents of the 1967 Act frankly conceded at the District Court hearing that resort to the simple device of transferring entire political subdivisions of known population between contiguous districts would have produced districts much closer to numerical equality. The District Court found, moreover, that the Missouri Legislature relied on inaccurate data in constructing the districts, and that it rejected without consideration a plan which would have markedly reduced population variances among the districts. Finally, it is simply inconceivable that population disparities of the magnitude found in the Missouri plan were unavoidable.[2] The New York apportionment plan of regions divided into districts of almost absolute population equality described in *Wells* v. *Rockefeller, post,* at 545–546, provides striking evidence that a state legislature which tries can achieve almost complete numerical equality among all the State's districts. In sum, "it seems quite obvious that the State could have come much closer to providing districts of equal population than it did." *Swann* v. *Adams,* 385 U. S. 440, 445 (1967).

We therefore turn to the question whether the record establishes any legally acceptable justification for the population variances. It was the burden of the State "to present . . . acceptable reasons for the variations among the populations of the various . . . districts . . . ." *Swann* v. *Adams, supra,* at 443–444.

---

[2] Contrary to appellants' assertion, we have not sustained the constitutionality of any congressional districting plan with population variances of the magnitude found in the Missouri plan. In *Connor* v. *Johnson,* 386 U. S. 483 (1967), the only issue presented to this Court was whether the districting plan involved racial gerrymandering. *Alton* v. *Tawes,* 384 U. S. 315 (1966), and *Kirk* v. *Gong,* 389 U. S. 574 (1968), involved situations where the lower courts themselves had reapportioned the districts on an emergency basis, and our affirmances were based on agreement with the use of the plans in that circumstance, and not on any view that the plans in question achieved equality as nearly as practicable.

## II.

We agree with the District Court that Missouri has not satisfactorily justified the population variances among the districts.

Missouri contends that variances were necessary to avoid fragmenting areas with distinct economic and social interests and thereby diluting the effective representation of those interests in Congress. But to accept population variances, large or small, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people. "[N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes." *Reynolds* v. *Sims, supra,* at 579–580. See also *Davis* v. *Mann,* 377 U. S. 678, 692 (1964).

We also reject Missouri's argument that "[t]he reasonableness of the population differences in the congressional districts under review must . . . be viewed in the context of legislative interplay. The legislative leaders all testified that the act in question was in their opinion a reasonable legislative compromise. . . . It must be remembered . . . that practical political problems are inherent in the enactment of congressional reapportionment legislation." [3] We agree with the District Court that "the rule is one of 'practicability' rather than political 'practicality.' " 279 F. Supp., at 989. Problems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster.

Similarly, we do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political

[3] Brief for Appellants 37–38.

subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries. The State's interest in constructing congressional districts in this manner, it is suggested, is to minimize the opportunities for partisan gerrymandering. But an argument that deviations from equality are justified in order to inhibit legislators from engaging in partisan gerrymandering [4] is no more than a variant of the argument, already rejected, that considerations of practical politics can justify population disparities.

Missouri further contends that certain population variances resulted from the legislature's taking account of the fact that the percentage of eligible voters among the total population differed significantly from district to district—some districts contained disproportionately large numbers of military personnel stationed at bases maintained by the Armed Forces and students in attendance at universities or colleges. There may be a question whether distribution of congressional seats except according to total population can ever be permissible under Art. I, § 2. But assuming without deciding that apportionment may be based on eligible voter population rather than total population, the Missouri plan is still unacceptable. Missouri made no attempt to ascertain the

---

[4] It is dubious in any event that the temptation to gerrymander would be much inhibited, since the legislature would still be free to choose which of several subdivisions, all with their own political complexion, to include in a particular congressional district. Besides, opportunities for gerrymandering are greatest when there is freedom to construct unequally populated districts. "[T]he artistry of the political cartographer is put to its highest test when he must work with constituencies of equal population. At such times, his skills can be compared to those of a surgeon, for both work under fixed and arduous rules. However, if the mapmaker is free to allocate varying populations to different districts, then the butcher's cleaver replaces the scalpel; and the results reflect sharply the difference in the method of operation." A. Hacker, Congressional Districting 59 (1964 rev. ed.).

number of eligible voters in each district and to apportion accordingly. At best it made haphazard adjustments to a scheme based on total population: overpopulation in the Eighth District was explained away by the presence in that district of a military base and a university; no attempt was made to account for the presence of universities in other districts or the disproportionate numbers of newly arrived and short-term residents in the City of St. Louis. Even as to the Eighth District, there is no indication that the excess population allocated to that district corresponds to the alleged extraordinary additional numbers of noneligible voters there.

Missouri also argues that population disparities between some of its congressional districts result from the legislature's attempt to take into account projected population shifts. We recognize that a congressional districting plan will usually be in effect for at least 10 years and five congressional elections. Situations may arise where substantial population shifts over such a period can be anticipated. Where these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them. By this we mean to open no avenue for subterfuge. Findings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an *ad hoc,* manner. Missouri's attempted justification of the substantial underpopulation in the Fourth and Sixth Districts falls far short of this standard. The District Court found "no evidence . . . that the . . . General Assembly adopted any policy of population projection in devising Districts 4 and 6, or any other district, in enacting the 1967 Act." 279 F. Supp., at 983.

Finally, Missouri claims that some of the deviations from equality were a consequence of the legislature's attempt to ensure that each congressional district would be geographically compact. However, in *Reynolds* v. *Sims,*

*supra,* at 580, we said, "Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing." In any event, Missouri's claim of compactness is based solely upon the unaesthetic appearance of the map of congressional boundaries that would result from an attempt to effect some of the changes in district lines which, according to the lower court, would achieve greater equality. A State's preference for pleasingly shaped districts can hardly justify population variances.

*Affirmed.*

[For dissenting opinion of MR. JUSTICE HARLAN, see *post,* p. 549.]

[For dissenting opinion of MR. JUSTICE WHITE, see *post,* p. 553.]

MR. JUSTICE FORTAS, concurring.

I concur in the judgment of the Court in these cases, but I cannot subscribe to the standard of near-perfection which the Court announces as obligatory upon state legislatures facing the difficult problem of reapportionment for congressional elections.

In *Wesberry* v. *Sanders,* 376 U. S. 1 (1964), this Court recognized that "it may not be possible to draw congressional districts with mathematical precision," and it held that the Constitution requires that they be drawn so that, "as nearly as is practicable," each representative

should cast a vote on behalf of the same number of people.

The Court now not only interprets "as nearly as practicable" to mean that the State is required to "make a good-faith effort to achieve precise mathematical equality," but it also requires that any remaining population disparities "no matter how small," be justified. It then proceeds to reject, *seriatim*, every type of justification that has been—possibly, every one that could be—advanced.

I agree that the state legislatures should be required to make "a good-faith effort to achieve" a result that allocates the population or the residents [1] of the State in roughly equal numbers to each district, based upon some orderly and objective method.[2] In my view, the State could properly arrive at figures for current population by taking the latest census returns and making modifications to allow for population movements since the last census (which the Court seems to find acceptable). It could also, in my opinion, discount the census figures to take account of the presence of significant transient or nonresident population in particular areas (an adjustment as to which the Court indicates doubt). If the State should proceed on some appropriate popu-

---

[1] I would find it constitutionally entirely acceptable for a State to base its apportionment on numbers of residents, rather than total population, in each district at the time the districts are established. This would permit adjustments to take account, for example, of distortions resulting from large numbers of nonresidents at military installations or colleges in an area.

[2] In *Avery* v. *Midland County*, 390 U. S. 474, 495 (1968), I argued in a dissenting opinion that consideration of disparate local interests might be appropriate with respect to defining certain types of local government units exercising limited governmental powers. I noted there, however, that the same factors could not justify departing from the one man, one vote theory in state legislatures— or, I might now add, congressional districts—because of the general and basic nature of the function performed.

lation basis such as I have suggested, producing approximately equal districts, trial courts, in my judgment, would be justified in declining to disapprove the result merely because of small disparities, in the absence of evidence of gerrymandering—the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes.

In considering whether the State has "approximated" an equal division and allocation of the population, I sympathize with the majority's view that a *de minimis* rule of allowable disparities tends to demean in theory and in practice the constitutional objective because it suggests that it is not necessary even to aim at equality. On the other hand, to reject *de minimis* as a statement of the limits on the rule of equality should not lead us to toss aside the wise recognition of the inscrutability of fact and the imperfection of man which is implicit in the *Wesberry* standard: "as nearly as practicable." This phrase does not refer merely to arithmetical possibilities. Arithmetically, it is possible to achieve division of a State into districts of precisely equal size, as measured by the decennial census or any other population base. To carry out this theoretical possibility, however, a legislature might have to ignore the boundaries of common sense, running the congressional district line down the middle of the corridor of an apartment house or even dividing the residents of a single-family house between two districts. The majority opinion does not suggest so extreme a practical application of its teaching, and I mention it only because the example may dramatize the fallacy of inflexible insistence upon mathematical exactness, with no tolerance for reality.

Whatever might be the merits of insistence on absolute equality if it could be attained, the majority's pursuit of precision is a search for a will-o'-the-wisp. The fact is that any solution to the apportionment and districting

problem is at best an approximation because it is based upon figures which are always to some degree obsolete. No purpose is served by an insistence on precision which is unattainable because of the inherent imprecisions in the population data on which districting must be based. The base to which Missouri's legislature should have adhered precisely, according to the majority, is the 1960 decennial census. The legislature's plan here under review was enacted in 1967. Assuming perfect precision for the 1960 census when taken,[3] by 1967, because of the movement of population within the State as

---

[3] The basic enumeration error in the census—that is the variation which would be observed between successive enumerations of the same area—is very low. Second surveys of selected areas, conducted by specially trained enumerators, produced counts varying by only about 1% for the whole population from the counts of the regular enumerators. For particular groups in the population, the variance was significantly larger. See U. S. Bureau of the Census, Evaluation and Research Program of the U. S. Censuses of Population and Housing, 1960, "Accuracy of Data on Population Characteristics as Measured by Re-interviews," Ser. ER–60, No. 4 (1964), Table 24, p. 22.

Far more significant than variations between successive enumerations are errors—virtually all undercountings—which are produced by the inherent limitations of the enumerating system. A Census Bureau estimate indicates that the 1960 census counted only 96.9% of the whole population, 3.1% of the people not being found and counted by the enumerators. Undercounting was not evenly distributed over the whole population. Instead, members of certain groups, notably young adult Negroes, were far more likely to be missed by the enumerators. For nonwhites in all age groups the census was estimated to understate the actual population by 9.5%. For young adult Negro males, undercounting reached nearly 20% for some five-year age groups. See generally, Siegel, Completeness of Coverage of the Nonwhite Population in the 1960 Census and Current Estimates, and Some Implications, Report, Conference on Social Statistics and the City (Washington, D. C., June 22–23, 1967) 13 (Heer ed., 1968). Because the heavily undercounted groups are not evenly distributed over the country, the differential rates of undercounting produce divergences between the actual relative populations of particular areas and those indicated by the census.

well as in-and-out migration, substantial disparities had arisen between the real distribution of population in the State and that reflected in the 1960 census base here so zealously protected by the Court.[4]

Nothing that I have said should be taken as indicating that I do not believe that the *Wesberry* standard requires a high degree of correspondence between the demonstrated population or residence figures and the district divisions. Nor would I fix, at least at this relatively early stage of the reapportionment effort, a percentage figure for permissible variation.[5]

In the present cases, however, I agree that the judgment of the District Court should be affirmed. The history of this reapportionment and of the legislature's failure to comply with the plain and patient directions of the three-judge District Court and the failure of the legislature to use either accurate 1960 census figures or other systematically obtained figures for all the districts— these factors strongly support the District Court's refusal

---

[4] The Census Bureau has estimated that of Missouri's 114 counties, 50 lost population between 1960 and 1966, while 64 gained. The independent city of St. Louis lost 57,900, or 7.7%; St. Louis County gained 146,000 or 20.8%. Outside St. Louis City and County, the absolute change ranged from a 22,100 increase in St. Charles County to a 7,100 decrease in Dunklin County. The percentage change ranged from a 41.7% increase in St. Charles County to a 21.4% decrease in Holt County. Estimates of the Population of Counties: July 1, 1966 (Report No. 3), Current Population Reports, Population Estimates, Ser. P–25, No. 407 (Bureau of the Census, October 10, 1968) 11–13.

[5] Cf. *Reynolds* v. *Sims,* 377 U. S. 533, 578 (1964):

"For the present, we deem it expedient not to attempt to spell out any precise constitutional tests. What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case. Developing a body of doctrine on a case-by-case basis appears to us to provide the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment."

to accept the Missouri plan. It is true that on the average, there was only a 1.6% variation from what the majority quaintly calls the "ideal" (meaning the 1960 census figures) and in only three of the 10 districts was there a variation of 2% or more, and it is also true that there is no finding of gerrymandering. But regardless of the possibility that variances within this range might in some situations be considered tolerable within *Wesberry*'s standard, I agree that we should sustain the District Court's rejection of the plan in light of the history of the cases and the record of the plan's preparation.