APPORTIONMENT OF IONIA COUNTY BOARD
OF COMMISSIONERS—1972

1. COUNTIES — COMMISSIONERS — APPORTIONMENT — CONSTITUTION-
AL LAW.
   An apportionment plan for the election of county commissioners
   which has a 14.1% deviation between the largest district and
   the smallest district, a deviation of 16.1% between the smallest
   district and the average district, and a maximum population
   variance ratio of 1:1.367 is potentially unconstitutional.

2. COUNTIES — COMMISSIONERS — APPORTIONMENT — CONSTITUTION-
AL LAW.
   Apportionment plans for the election of county commissioners
   that results in a minimum population variance of 1:1.14 are
   unconstitutional where the plans were not submitted in good
   faith to achieve equal population districts as shown by the
   fact that all plans confined themselves to the use of the prin-
   cipal political subdivisions of the county as the basis for
   apportionments (US Const, Am XIV).

3. COUNTIES—COMMISSIONERS—APPORTIONMENT—EQUAL POPULATION
DISTRICT—CONSTITUTIONAL LAW.
   Division or combination of parts of political subdivision must
   give way and be governed by the higher principle of equal
   population districts in the apportionment of county commis-
   sioners' districts.

4. COUNTIES—COMMISSIONERS—APPORTIONMENT—EQUAL POPULATION
DISTRICTS—CONSTITUTIONAL LAW.
   A county which cannot achieve equal population districts for
   the election of county commissioners by using existing politi-

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 25 Am Jur 2d, Elections § 16 et seq.
[3] 25 Am Jur 2d, Elections § 19 et seq.
[4] 25 Am Jur 2d, Elections § 22 et seq.
[5] 25 Am Jur 2d, Elections § 20 et seq.
[6] 25 Am Jur 2d, Elections § 27.

cal subdivisions, must use the Census Bureau enumeration districts; if population equality cannot be reached, either actual counts to divide the census units or special United States Census Bureau's counts must be used.

5. COUNTIES — COMMISSIONERS — APPORTIONMENT — CONSTITUTIONAL LAW.
   Public apathy regarding apportionment cannot be used by officials as a waiver of the constitutional right to equal population election districts.

6. COUNTIES — COMMISSIONERS — APPORTIONMENT — RURAL-URBAN DIVERSITY — CONSTITUTIONAL LAW.
   The diversity of rural and urban interests in a county is no justification for deviance from the constitutional mandate of equal population election districts for county commissioners.

Original statutory action in Court of Appeals to review apportionment plan. Submitted Division 3 April 18, 1972, at Lansing. (Docket No. 13900.) Decided April 19, 1972.

Petition by Laban A. Smith for review of the apportionment plan filed by the Ionia County Apportionment Commission. Remanded with instructions to the Ionia County Apportionment Commission.

*O'Connor, McNamara & O'Keeffe,* for petitioner.

*Walter M. Marks,* Ionia County Prosecuting Attorney, for the apportionment commission.

Before: DANHOF, P. J., and McGREGOR and QUINN, JJ.

PER CURIAM. The statute providing for the apportionment of county boards of commissioners[1] is close to being a model of a tightly organized, finely worded piece of legislative drafting, which has a

---

[1] 1966 PA 261; MCLA 46.401 *et seq;* MSA 5.359(1) *et seq.*

central aim and a rationale or methodology by which to achieve this aim. The central aim of the legislation is to insure that the equal protection clause of the Fourteenth Amendment to the United States Constitution is applied to the election of county boards of commissioners.

The methodology was to establish a county apportionment commission mandated to apportion the county into districts within a range based on the population of the county at least once after each United States Decennial Census.[2] Preeminent to the drafters was the prescription that "All districts shall be single-member districts and as nearly of equal population as is practicable".[3] Additionally, only "the latest official published figures of the United States Official Census shall be used in this determination . . ".[4]

The drafters were aware of the nature of the "official published figures of the United States Official Census". They knew that in the vast majority of the counties[5] in this state, the official census figures were published in what is known as Group I data, wherein the official census units are known as enumeration districts. Enumeration districts are drawn upon or within existing political subdivisions to achieve population units the census bureau considers feasible to work with in terms of numbers. In several counties[6] of this state which contain densely populated areas, the census bureau utilizes what is termed as Group II data, or census tracts, and Group III data, or block tracts.

Using the census units as, so to speak, building blocks, the apportionment commissions are directed

---

[2] MCLA 46.401; MSA 5.359(1), and MCLA 46.402; MSA 5.359(2).
[3] MCLA 46.404(a); MSA 5.359(4)(a).
[4] *Ibid.*
[5] Approximately 64 counties.
[6] Approximately 19 counties.

to arrange contiguous census units in such a fashion as to achieve commissioner districts of equal population. Since the number and size of the census units obviously impose certain limitations upon the apportionment commissions, the Legislature foresaw that in some instances it would be impossible to achieve districts of equal population with only the census units provided by the United States Department of Commerce. In such event, the act provides that an official census unit may be divided only on the basis of "an actual population count", and only for the purpose of achieving the standard of population equality.[7]

Exercising additional foresight, the Legislature, taking into account the fact that the United States Census was only taken once every ten years, realized that an individual county could undergo massive population shifts within such ten-year period. If the county desired to reflect any significant population shifts by redrawing their commissioner districts, the act permits this, provided that it be based upon one of two standards: (1) The county may enter into a contract with the United States Census Bureau for the purpose of making a *"special census"* of the *entire county;*[8] or (2) if, by chance, "other governmental *census figures of total population"* (emphasis added) for the county have been obtained subsequent to any decennial census, they may be used.[9] However, in each instance, the use is qual-

---

[7] MCLA 46.404(a); MSA 5.359(4)(a).

CF. *Apportionment of Van Buren County Board of Commissioners—1972*, 39 Mich App 658 (1972), where enumeration districts were split for purposes other than the achievement of population equality. Also see *Apportionment of Cass County Board of Commissioners—1972*, 39 Mich App 671 (1972), for an example of the method approved by this Court to split census units for the sole purpose of achieving population equality.

[8] MCLA 46.404(a); MSA 5.359(4)(a).

[9] *Ibid.*

Obviously the unit of government securing the "census figures

ified by the necessity of the county to show that the latest United States Decennial Census figures are "not adequate for the purposes of this act". Obviously, the two primary reasons for United States Decennial Census figures being "not adequate" for the purpose of apportioning commissioner districts so that they contain units of equal population would be either where population shifts have rendered decennial census figures sufficiently unreflective of present population groupings, or where the census units utilized by the decennial census are so unrefined as to render the drafting of commissioner districts for the size of the board desired impractical or impossible.

Having discussed the methodology of apportionment under the act, we now turn our attention to a concrete example. The 1970 Decennial Census revealed that the County of Ionia had a total population of 45,848. However, there are three state institutions located within the boundaries of the County of Ionia whose residents "cannot by law register in the county as electors".[10] At the time the 1970 Decennial Census was taken, the population count of three state institutions totalled 2,449. Under the provisions of the act, these county residents must "be excluded from any consideration of representation".[11] Consequently, subtracting the institution population from the appropriate enumeration districts, the population of Ionia County for pur-

of total population" cannot be the county involved or any of its political subdivisions. Reference is, of necessity, only to population figures covering the entire county secured by the state or Federal governments. Any county desiring new or more refined data on population within its boundaries is limited to the first standard; *i.e.*, contracting with the U. S. Census Bureau for a "special census" of the entire county. Otherwise, the standard of objective and verifiable population data is subject to corruption.

[10] MCLA 46.404(g); MSA 5.359(4)(g).

[11] *Ibid.*

poses of the act is 43,399. Under the statute, the population of Ionia County permits the number of supervisors to be not less than 5 nor more than 15.[12]

Ionia County contains 19 units of principal political subdivisions—3 cities and 16 townships.[13] In the 1970 Decennial Census, the three cities were divided into 17 enumeration districts. Twelve of the townships were divided into 35 enumeration districts, and 4 townships each constituted an enumeration district in itself. Therefore, Ionia County has a total of 56 enumeration districts, or census units, that may be utilized as building blocks in order to construct commissioner districts. However, the apportionment commission for the county of Ionia decided they would not use the 56 enumeration districts as building blocks for commissioner districts, but rather would confine themselves to the 19 units which were political subdivisions. As a result, the Ionia Apportionment Commission adopted a nine-member plan[14] drawn entirely along the lines of political subdivisions, except for a single instance where a portion of the city of Ionia is attached to the entire township of Ionia. The result is that the

---

[12] MCLA 46.402; MSA 5.359(2)

[13] There are 7 villages included within the boundaries of the 16 townships.

[14] Ionia County Nine District Plan (Approved by the Ionia County Apportionment Commission on March 1, 1972).

| District | | | | | |
|---|---|---|---|---|---|
| 4 | 4047 | | Maximum Population | Variance Ratio | 1:1.367 |
| 6 | 4138 | | | | |
| 9 | 4663 | | Minimum Population | Electing a Majority | 22,465 or 51.76% |
| 5 | 4667 | | | | |
| 8 | 4950 | 22,564 or 51.76% | | | |
| | —— | | Average Population of District | | 4,822 Total=43,399 |
| 3 | 5104 | | Deviation of Largest District from Average | | 710 or 14.72% |
| 1 | 5121 | | | | |
| 2 | 5177 | | | | |
| 7 | 5532 | 20,934 or 48.24% | Deviation of Smallest District from Average | | 775 16.07% |
| | —— | | | | |

deviation of the largest district from the average is 710, or 14.7 per cent; the deviation of the smallest district from the average is 775, or 16.1 per cent; the maximum population variance ratio is 1:1.367—patently unconstitutional by any standard.

The record filed by the Ionia Apportionment Commission reveals that they had a total of 12 plans before them for consideration: four 9-member plans; two 11-member plans; and one each of 5-, 6-, 7-, 8-, 13- and 14-member plans. The five-through eight-member plans left every political subdivision intact. All of the 9-, and one of the 11-member plans made only one split of a political subdivision—that is, Ionia city. One of the 11- and the 13-member plans made single splits in the cities of Ionia and Belding. Finally, the 14-member plan made a single split of all 3 of the cities within the county.

As for population variance ratios, the smallest from all the 12 plans considered by the commission were in the 5-member and one of the 11-member plans—each with 1:1.17. The petitioner submits for our consideration his own 5-member plan, which has a population variance ratio of 1:1.14 and, again, does not divide any of the 19 principal political subdivisions.

Not one of the 12 plans considered by the commission, nor the plan submitted by the petitioner, can be approved as constitutional because none of the total of 13 plans before us demonstrates that the drafters are in good faith trying to achieve population equality. On the contrary, by publicly sanctifying the boundaries of the 19 political subdivisions and refusing to utilize census units and other techniques mandated by the statute, the drafters have demonstrated their lack of good faith.

In *Avery* v *Midland County*,[15] the United States Supreme Court clearly stated: "The conclusion of *Reynolds* v *Sims* was that bases other than population were not acceptable grounds for distinguishing among citizens when determining the size of districts used to elect members of state legislatures. Today we hold only that the Constitution permits no substantial variation from equal population in drawing districts for units of local government * * * ".[16]

Section 4 of the act providing for apportionment of boards of commissioners clearly states that the division or combination of parts of political subdivisions must give way and be governed by the higher principle of districts of equal population.[17]

In *Kirkpatrick* v *Preisler*,[18] the United States Supreme Court reaffirmed its statement in *Swann* v *Adams*[19] that the burden is upon the drafters "to present * * * acceptable reasons for the variations among the populations of the various * * * districts * * * ".[20] The Court then went on to state unequivocally: "Similarly, we do not find legally acceptable the argument that variances are justified if they necessarily result from a state's attempt to avoid fragmenting political subdivisions * * * ".[21]

This Court stated in *Apportionment of Allegan County Board of Supervisors—1968*,[22] "section 4(a) thereof makes the basic requirement of county apportionment 'single-member districts and as nearly of equal population as is practicable'. The remaining mandatory guidelines specified in sections 4(b)

---

[15] 390 US 474; 88 S Ct 1114; 20 L Ed 2d 45 (1968).
[16] *Ibid.* pp 484–485; 1120; 53.
[17] MCLA 46.404(a); MSA 5.359(4)(a).
[18] 394 US 526; 89 S Ct 1225; 22 L Ed 2d 519 (1969).
[19] 385 US 440; 87 S Ct 569; 17 L Ed 2d 501 (1967).
[20] *Kirkpatrick* v *Preisler, supra,* pp 532; 1230; 526.
[21] *Ibid.* pp 533–534; 1230; 526.
[22] 13 Mich App 692, 695 (1968).

through (h) are subsidiary to (a), and while they are to be followed in formulating an apportionment plan, and while they may assist in determining the practicality of population variance between districts, they will not justify districts of substantially unequal population."[23]

In our last published opinion dealing with county apportionment, we stated: "Laudable as may be the efforts to avoid gerrymandering and the fragmenting of political subdivisions, these two have been rejected by the Supreme Court if they are used to avoid equal population  *  *  *  We adopt the principles laid down in *Kirkpatrick* v *Preisler,* and determine that the Muskegon County Apportionment Commission has not justified the variances contained in the instant plan".[24]

By limiting themselves to the preservation of political subdivisions, the Ionia County Apportionment Commission has limited itself to the possible combinations of 19 contiguous units, as opposed to the greater flexibility they would have had in using the 56 census units. Having examined all of the plans before the commission and the 19 principal population units they would work with, we can categorically state that there is no plan of any board size that the commission can draft along the lines of political subdivisions which will adhere to the equal protection clause of the Fourteenth Amendment of the United States Constitution. Furthermore, if through the use of the combining of enumeration districts, the Ionia County Apportionment Commission still cannot reach population equality, they must go on to the next logical step required under the statute —that is, take actual counts to divide the census

---

[23] *Ibid.* p 695.
[24] *Apportionment of Muskegon County Board of Commissioners— 1970,* 23 Mich App 156 (1970), pp 160–161.

units. If, in following this statutory methodology, the commission is unhappy with the result, then they may contract with the United States Census Bureau for purposes of a special census which would provide them with as many census units in as many geographical locations as they may desire.

We cannot leave this point without making some comment upon the reason that the Ionia County Apportionment Commission advanced as a justification for denying the people within their county the protection of the Fourteenth Amendment. The second from the last paragraph in the official minutes of the Ionia County Apportionment Commission for Wednesday, February 9, 1972, reads as follows: "It was noted by the commission that even though publications and radio announcements have been made regarding this meeting, that only nine persons were in attendance, other than the members of the commission, with five of the nine persons present being members of the present board of commissioners. This could indicate that there is not as much interest in such division of the county to warrant total equalization by splitting precincts and townships."

Many observers have often commented on the tendency of the public in our American democracy, as well as under other government systems, to be disinterested and apathetic, even when the issue before the public happens to be the preservation of a constitutional right. We feel somewhat chagrined to be forced to reaffirm the basic principle that public indifference or apathy cannot be treated by officials as a waiver of the constitutional rights guaranteed to the people of this state and this nation. The members of the Ionia County Apportionment Commission have been entrusted with the duty of preserving to the people of the County of Ionia their

constitutional right to the equal protection of the laws.

The commission also requests this Court to consider the "diversity of rural and urban interests in Ionia County" as a justification for a population variance ratio of 1:1.367 as "of no significant constitutional variance from the equal protection clause * * * ".[25] This we cannot and shall not do. The commission has in no way demonstrated that there is a "diversity of rural and urban interests in Ionia County". Even if they had demonstrated such a diversity, it would be no justification for deviance from the constitutional mandate of equal population.[26]

We hold the apportionment plan adopted by the Ionia County Apportionment Commission to be in violation of the United States Constitution. We remand this matter to the Ionia County Apportionment Commission with the express instructions that they draft a new plan for the apportionment of the board of commissioners which shall guarantee to the people of the County of Ionia districts of equal population. The commission shall file a copy of a new plan with the Clerk of the Court of Appeals and the Secretary of State within ten days from the date of this opinion. In turn, the Clerk of this Court shall forthwith present to this panel for their further review the plan filed by the Ionia County Apportionment Commission.

---

[25] "Response to order to show cause", p 6.
[26] *Kirkpatrick* v *Preisler*, supra, pp 533; 1230; 526.