APPORTIONMENT OF OAKLAND COUNTY BOARD OF
COMMISSIONERS—1972

1. COUNTIES—APPORTIONMENT—DISTRICTS—IRREGULAR SHAPES.

County commissioners' districts should be designed to represent
people, not political subdivisions; therefore, defendant appor-
tionment commission's contention that any plan with a vari-
ance of under 100 would necessitate the violation of political
subdivision boundaries and preclude compactness by necessitat-
ing odd shapes in the districts is not sufficient to justify
population variances.

2. COUNTIES—APPORTIONMENT—PLAN—DE MINIMIS STANDARD—CON-
STITUTIONALITY.

A county apportionment plan is unconstitutional where the ap-
portionment commission demonstrates a lack of a good-faith
attempt to achieve districts of equal population by passing an
adopting resolution which establishes an arbitrary population
variance figure as *de minimis,* thus precluding districts of equal
population, summarily rejecting an orderly inquiry into other
revised plans before it to determine what effect they would
have on the total context of the statutory guidelines, and
negating the possibility of achieving constitutional and mathe-
matical exactness.

3. COUNTIES—APPORTIONMENT—EQUAL POPULATION—PRECINCT SPLIT-
TING.

The federal constitution and the county apportionment statute
require the splitting of precincts to achieve districts of equal
population; election precincts are nothing more than artificial
administrative units used by local election officials to facilitate
the election process and the precincts possess no intrinsic or
inherent quality which gives them an inviolate status above a
constitutional right.

REFERENCES FOR POINTS IN HEADNOTES
[1] 25 Am Jur 2d, Elections §§ 18, 23.
[2] 25 Am Jur 2d, Elections §§ 16, 27.
[3] 25 Am Jur 2d, Elections § 12 *et seq.*

Original statutory action in Court of Appeals to review apportionment plan. Submitted Division 2 May 19, 1972, at Grand Rapids. (Docket No. 13922.) Decided May 23, 1972. Application for leave to appeal dismissed on stipulation on June 7, 1972.

Petition by Morley A. Winograd for review of a county apportionment plan filed by the Oakland County Apportionment Commission and for a new plan conforming with statutory and constitutional requirements. Reversed and remanded with instructions.

*Hartman, Beier, Howlett, McConnell & Googasian,* for plaintiff.

*Patterson & Patterson, Whitfield, Manikoff & White* (by *Lawrence R. Ternan)* and *Denison, Devine, Porter & Bartush,* for defendant.

Before: FITZGERALD, P. J., and R. B. BURNS and T. M. BURNS, JJ.

PER CURIAM. The petitioner seeking review of the Oakland County apportionment plan is Morley A. Winograd, the Oakland County Democratic Chairman and member of the Oakland County Apportionment Commission. The other members of the commission are Sheldon B. Smith, Oakland County Republican Chairman; Lynn D. Allen, County Clerk and Chairman of the Commission; C. Hugh Dohany, County Treasurer; and Thomas G. Plunkett, Prosecuting Attorney. Mr. Plunkett is a Democrat; Messrs. Allen and Dohany are Republicans.

Early in their deliberations, the Oakland County Apportionment Commission exhibited a considerable amount of unanimity. On January 20, 1972,

the commission unanimously adopted a set of nine rules of procedure.[1] Again, at the commission meeting of February 7, the minutes reveal unanimous adoption of another motion as follows:

"Mr. Smith made the motion, supported by Mr. Plunkett that the commission hold its next meeting on February 15th at 3:00 p.m., at the county courthouse and any proposed apportionment plans should be submitted at that meeting in order for there to be sufficient time for the planning department to review and compute the population figures in the various districts of any proposed plan and for there to be sufficient time for the commissioners' deliberations on the proposed plans.

"Motion carried."

Before the meeting of February 7 terminated, Mr. Winograd submitted to the other members of the commission a plan[2] for a 35-man board of commissioners, which was labeled as Plan I.

---

[1] Among the 9 rules we are compelled to quote in full rule:

"8. Only members of the Apportionment Commission may submit plans for reapportionment of the County to the Commission and plans may be submitted at any time during the term of the Commission except as otherwise provided by statute."

We question whether this "exclusiveness" is in keeping with the spirit of the County Apportionment Act or the specific provisions of § 7 (see footnote 2) which reads as follows:

"Sec. 7. If the apportionment commission has failed to submit a plan for its county within 60 days but not less than 30 days after the latest official published census figures are available or within such additional time as may be granted by the court of appeals for good cause shown on petition from the apportionment commission, any registered voter of the county may submit a plan to the commission for approval. The commission shall choose from among those submitted to it a plan meeting the requirements of the laws of this state and file such plan in the office of the county clerk as set forth in section 5 within 30 days after the deadline for the filing of the commission's own plan or any extension granted thereon." MCLA 46.407; MSA 5.359 (7).

[2] Factually, what occurred is that the commission "failed to submit any plan for its county within * * * less than 30 days after the latest official published census figures". The census was officially published on January 4, 1972. The first commission plan was not submitted until February 7 (the 34th day) and the deadline resolution of February 15 when the three other plans were submitted was the 42nd day. Consequently, on the 30th day, or February 3, 1972, registered voters of Oakland County were possessed of the statutory right to submit

At the next meeting of February 15, three more plans were submitted to the commission. Mr. Plunkett submitted a plan for a 25-man board which was labeled Plan II. Mr. Dohany submitted a plan for a 31-man board which was labeled Plan III. Mr. Winograd proposed a plan for another board of 31 members, which came to be known as Plan IV.

The next meeting of February 25 began with a verification of the four plans from the Oakland County Planning Department. They revealed that Plan I possessed a total population spread of 4,431 people between the highest and lowest districts, resulting in a population variance ratio of 1:1.18. At this point in time Plan I was relegated to obscurity because of the unacceptable population variance ratio and noncontiguous districts.[3] The same result awaited Plan II, which could not be fully verified.[4]

Plan III demonstrated an eventually verified population spread of 283[5] between the lowest and the highest districts, for a population variance ratio of 1:1.01. Plan IV purported to have a population spread of 434, but the memorandum from the Oakland County Planning Department indicated that "24 of the 31 districts do not balance to verified totals. The verified total of all districts is also less than the county total of 907,871".[6]

plans to the commission for their approval. Fortunately, due to our holding in this cause, it is not necessary for us to determine what effect its published rule 8 had on subsequent commission action.

[3] See "Defendant's Exhibits", Exhibit A, specifically planning department memorandum of February 11, 1972.

[4] *Ibid,* Exhibit B, specifically planning department memorandum of February 23, 1972.

[5] *Ibid,* Exhibit C, specifically planning department memorandum of February 24, 1972, which indicates changes were made on the plan up to February 23, 1972.

[6] *Ibid,* Exhibit D, planning department memorandum of February 24, 1972.

At this point, maneuvering for position began with reference to Plans III and IV. The initiative was taken by Mr. Winograd who immediately submitted to the commission a revision of his Plan IV, which purported to have a total population spread of 86,[7] and moved for its immediate adoption on the basis that it was the plan which came closest to the goal of districts of equal population. At this point, a post-motion recess was adopted by a majority of the commission. Upon reconvening the session, Mr. Winograd's motion was defeated by a vote of 3–2, with Messrs. Winograd and Plunkett in the minority. Mr. Winograd immediately moved "that discussion of this plan be held again at another meeting next week". The first vote on this motion was 1–1, with three abstentions. However, after recess, the motion was adopted by a vote of 3–0, Mr. Smith joining Messrs. Winograd and Plunkett in securing a continuance of the discussion on revised Plan IV.

The final meeting of the commission on February 28 began with a memorandum from the Oakland County Planning Department verifying the revision of Plan IV and correcting the total population spread to 132, for a population variance ratio of 1:1.00452.[8] Mr. Dohany then submitted a revision to his Plan III which would reduce the population spread to 111, for a population variance ratio of 1:1.00379.[9] This move induced Mr. Wino-

---

[7] *Ibid,* Exhibit E, specifically planning department memorandum of February 28, 1972, which indicates changes telephoned in after submission of the plan and a verified population spread of 132.

[8] *Ibid.*

[9] *Ibid,* Exhibit F, specifically planning department memorandum of February 29, 1972, the second memorandum of verification of the first revision to Plan III which suggests a revision made on the same date, or one day following adoption of this plan. However, petitioner in his exhibit 8 attached to his "Petition for Review" alleges the population

grad to offer his second revision of Plan IV purporting to reduce the population spread between the highest and the lowest districts to but 12.[10] Whereupon, Mr. Dohany immediately offered to the commission a second revision to Plan III purporting to reduce the population spread to 10.[11]

spread to be 127. Then in his "Reply Brief" plaintiff alleges that he subsequently discovered errors in the adopted plan which were confirmed by the planning department in a memorandum of April 17, 1972 (exhibit 8 of "Reply Brief"). The errors allegedly changed the population spread of the plan as adopted to 311. Exhibit 9 to his "Reply Brief" (planning department memorandum dated April 17) indicates that somebody made a "correction" to the adopted plan on April 17, 1972.

On April 20, 1972, the defendant commission majority filed a "Supplement to Answer" admitting "the adopted plan is in need of one minor correction". This document then purports to make the needed "correction" described as: "The revision is simply changing the location of the boundary line between Districts VI and VII. The population and mathematical totals have not been changed. *Only the boundary line between these two districts has been changed*". (Emphasis in original.)

As best we can discern, the original adopted plan failed to place certain census tracts into District VII, possibly as a result of a copyist's haplograph, since the population figures are alleged to be the same. Consequently, when the legal description of the boundaries was drafted and adopted by the commission on February 28, the boundaries placed the unintended census tracts into District VI, turning Districts VI and VII into the smallest and largest districts with a population spread of 311 instead of 111. An attached planning department memorandum dated April 18, 1972, verifies the "change of District VI and VII" in relation to an unidentified memorandum dated April 17, 1972, apparently purporting to make such a change in the adopted plan.

Again, we consider our holding in this cause to be fortunate in that it is not necessary for us to determine whether the "correction" was made pursuant to statute and is valid.

[10] Defendant alleges in his Exhibit G that as verified by the planning department on April 4, 1972, in response to an unidentified submission of the second revision dated March 30, 1972, the total population variance is 200. Apparently, plaintiff also made a mistake in his second revision to Plan IV on February 28 and submitted his correction to the planning department on April 17, 1972, which in turn verified the correction in a memorandum dated April 17, 1972 (see exhibit 9 in plaintiff's "Reply Brief") for a new total population variance of 14.

[11] See defendant's exhibit H. As originally submitted on the 28th of February, the verified population spread was 56 (defendant's "Answer to Court", p. 2). A subsequent "corrections" from Mr. Dohany to Mr.

After a much-needed recess, Mr. Dohany submitted the following motion, which we quote in full:

"Mr. Dohany: Whereas any variation below 100 is not practical and makes a shambles out of the various local units precinct boundaries, I move the adoption of Apportionment Plan 3 as it has been amended by amendment 1 and amendment 2, for electing county commissioners for the County of Oakland, and the chair is hereby directed, after it has been typed and put in final form, and upon the signing of said plan by at least a majority of the apportionment commission, to file said plan as the Official Apportionment Plan for the County with the Oakland County Clerk, and the Michigan Secretary of State, as required by law. Supported by Mr. Smith."

Thereupon, a roll call vote was taken, and the first revision of Plan III was adopted as the plan for the Oakland County Board of Commissioners by a vote of 3–2. Voting in the majority were Messrs. Allen, Dohany and Smith; voting in the minority were Messrs. Plunkett and Winograd.

To this day, the parties apparently still dispute what are the verified figures[12] for the two revisions

Allen dated March 3, 1972 purported to correct the population spread to 10. However, the mistake discussed in footnote 9 was repeated in the second revision of Plan III (see admission in defendant's "Supplement to Answer").

[12] We hope that the reader has found some enlightenment in the preceding footnotes. We believe they reveal the practice we cannot condone of individual members conducting private intercourse with the planning department staff relating to verifications and corrections with verifications to the various versions of Plans III and IV. As a result, the commission members did not always have the full facts before them. We must also note that the parties have been highly selective in the documents they have filed with this Court. We trust these difficulties shall not recur on remand.

We also take note that the three revisions of plans, including the adopted plan, were all submitted for the first time at the final meeting of the commission on February 28. Not one was verified or analyzed before revised Plan III was adopted. This was true despite the fact that the commission still had seven work days before the statutory deadline of March 6, 1972. Another indication of the inex-

made, respectively, to Plans III and IV. Whatever the true figures may be is largely irrelevant in view of the fact that there is apparent agreement and support on the record that at least two of the revisions of the plans for a 31-man board possess a lower population variance ratio than the plan adopted, and at least one of the revisions splits less political subdivisions into fewer segments than the plan adopted.[13] What is relevant in our review

plicable haste of this commission is that the final meeting of the 28th began at 10:20 a.m. and was adjourned at 10:42 a.m., with time off for a 10-minute recess. Consequently, the total amount of time that the commission gave to a study of three plans supposedly never seen before was at best 22 minutes.

We need not comment here on the obvious partisan maneuverings. We only regret that partisan competition on the commission did not have the same salutary result as evidenced in *Apportionment of Kent County Board of Commissioners—1972*, 40 Mich App 508, (1972), where each party finally maneuvered to a zero deviation plan.

[13] Plaintiff alleges that a comparison of the adopted plan to the second revision of Plan IV demonstrates 21 political subdivisions split into 72 segments as opposed to 19 political subdivisions split into 52 segments. As for combinations of political subdivisions, the totals are 32 for the adopted plan and 28 for the second revision of Plan IV. At no time has the defendant ever disputed these figures contained in exhibits 9 and 10 of plaintiff's "Petition to Review" as follows:

### EXHIBIT 9

Splits of Local Subdivisions
Oakland County Board of Commissioners Apportionment

|  | Plan III with Amendments 1 & 2 | Second Revision of Revised Plan IV |
|---|---|---|
| A. Cities Split |  |  |
| 1. Number of Cities | 10 | 8 |
| 2. Segments Created | 38 | 25 |
| B. Townships Split |  |  |
| 1. Number of Townships | 11 | 11 |
| 2. Segments Created | 34 | 27 |
| C. Total Splits |  |  |
| 1. Number of Communities | 21 | 19 |
| 2. Segments | 72 | 52 |

### EXHIBIT 10

Combination of Cities and Townships
Oakland County Board of Commissioners Apportionment

is whether or not the commission demonstrated on the record a good-faith attempt to achieve districts of equal population.

This brings us of necessity to an examination of the events of the final meeting of the commission on February 28, and in particular the Dohany resolution. In response to the allegation of the plaintiff that the Dohany resolution was a *de minimis* resolution, the defendant states that it "denies that the resolution by which the apportionment plan was adopted contained a *de minimis* resolution but rather a statement that the plan to be adopted best conformed to the hierarchy of guidelines prescribed by the act".[14]

|  | Plan III with Amendments 1 & 2 | Second Revision of Revised Plan IV |
|---|---|---|
| A. Number of Districts combining City and Township territory | 16 | 13 |
| B. Number of Communities Combined | | |
| 1. Number of Cities combined with Townships | 18 | 17 |
| 2. Number of Townships combined with Cities | 14 | 11 |
| 3. Total number of Subdivisions combined others of different nature | 32 | 28 |

Also see *In re Apportionment of State Legislature—1972*, 387 Mich 442, 456 (1972) where the Supreme Court gave the following advice: "In end analysis, mathematical exactitude re equality of population is the primary and controlling standard. As between competing plans with identical 'equality of population' factors, attention may then be focused upon other considerations such as compactness, shape, etc."

[14] "Answer to Petition", p 11. Defendant rephrases his basic contention slightly on page 5 of "Answer to Court" as follows:

"4. Answering paragraph 4, defendant states that the resolution by which the apportionment plan was adopted was not a *de minimus [sic]* resolution establishing an absolute minimum population variance, but was a statement, based upon actual work on plans involving variances of 100, 50 and lower, recognizing that lower variances in a *31-district plan for Oakland County* are not 'practicable' in light of the total hierarchy of statutory guidelines, equality of population being by far the most important."

Later in its brief, defendant again emphasizes that the resolution was only a statement that any variation below that of 100 was not practicable "because lower variations require \* \* \* outcroppings across district boundary lines; and because lower variations require \* \* \* a total disregard for those statutory guidelines [of compactness, squareness, and minimization of divisions and combinations of local units]".[15] If we may rephrase defendant's argument in a more concise fashion, it is that any plan with a variance of under 100 would necessitate (1) the violation of the boundaries of political subdivisions, and (2) preclude compactness by necessitating odd shapes in the districts.

With reference to the argument on the violation of political subdivisions, this Court has amassed in its *Ionia* opinion[16] a long line of authority in an attempt to drive home the point to drafters that county commissioners' districts should not be de-

---

[15] Defendant's "Brief" pp 7-8, which we reproduce in its entirety:

"Defendant Commission does take great issue with the argument that the motion by which the Oakland County Apportionment Plan was adopted was an approval of a *de minimis* population variance standard. It was no such animal. It was simply a statement that the formulation of a *31 district plan for Oakland County, Michigan* with a total variation below the range of 00.3% to 00.4% was not practicable, because lower variations require zig-zags and finger and sliver outcroppings across district boundary lines; and because lower variations require not just the proper subordination of the guidelines requiring compactness, squareness, and minimization of divisions and combinations of local units, but instead require a total disregard for those statutory guidelines. The Commission points to the plan denoted as Amendment #3 to Plan III (Mr. Dohany's 10 Plan) which has a verified total population variance of 10 or 00.034%. The map of this plan superimposes its district boundary lines in red lines on the black boundary lines of the adopted Apportionment Plan. It graphically demonstrates the type of boundary lines which result in a *31 district plan for Oakland County* when population variances are squeezed below 00.3%."

This quotation and the two references in footnote 14 are the total extent of defendant's argument on the *de minimis* issue.

[16] *Apportionment of Ionia County Board of Commissioners—1972,* 39 Mich App 676 (1972), at pages 683-685. Also *cf.* footnote 13.

signed to represent political subdivisions, but to represent people.

As for the argument of odd shapes, we believe it is succinctly answered for the defendants by the United States Supreme Court when it said in *Kirkpatrick v Preisler,* 394 US 526, 536; 89 S Ct 1225, 1231; 22 L Ed 2d 519, 528 (1969):

"Missouri's claim of compactness is based solely upon the unaesthetic appearance of the map of congressional boundaries that would result from an attempt to effect some of the changes in district lines which, according to the lower court, would achieve greater equality. A State's preference for pleasingly shaped districts can hardly justify population variances."

Consequently, defendant's brief attempt to specifically justify the variations in the adopted plan by a general statement instead of the required separate analysis of the variation in each district is simply against the weight of established authority. We require proofs, not generalizations.

Although defendant's attempt to explain the Dohany resolution of February 28 is appreciated, we must look to the language of the resolution itself. This language is extremely explicit in that it states that "Any variation below 100 is [1] not practical and [2] makes a shambles of the various local units precinct boundaries". Again, we turn to the United States Supreme Court. It said the following about any attempt to fix a numerical or percentage population variance below which deviances are excused as not practicable:

"We reject Missouri's argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy without question the 'as nearly as practicable' standard. *The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical*

*standards which excuse population variances without regard to the circumstances of each particular case* * * * *the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality.* [Citation omitted.] Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

"There are other reasons for rejecting the de minimis approach. *We can see no nonarbitrary way to pick a cutoff point at which population variances suddenly become de minimis. Moreover, to consider a certain range of variances de minimis would encourage legislators to strive for that range rather than for equality as nearly as practicable * * * .*

"Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives. Toleration of even small deviations detracts from these purposes."[17] (Emphasis added.)

Regardless of how the majority of the commission attempts to characterize the language of their resolution, the plain fact is that it establishes an arbitrary population figure as *de minimis.* In so doing, it has precluded what it alleges to quest for —districts of equal population. In so doing, it summarily rejects an orderly inquiry into two revised plans before it to determine what effect they would have on the total context of the statute's guidelines. In so doing, it simply and abruptly negates the everpresent possibility of achieving constitutional and mathematical exactness. In so doing, it demonstrates the lack of a good-faith effort.

As for the "precinct shambles" portion of the

---

[17] *Kirkpatrick v Preisler, supra,* at pages 530–531. In this Court's opinion of *Apportionment of Muskegon County Board of Commissioners—1970,* 23 Mich App 156, 161 (1970), we stated unequivocally: "We adopt the principles laid down in *Kirkpatrick v Preisler * * * ."

resolution, neither party argues the point in their briefs. If the matter is of such concern, we are surprised the parties have not even bothered to inform this Court as to the number of precincts that may be affected by the various plans. To this argument we can only state with more explicitness what we have already implied:[18] election precincts are nothing more than artificial administrative units used by local election officials to facilitate the election process. They possess no intrinsic or inherent quality which gives them an inviolate status above a constitutional right. Not only the constitution, but the county apportionment statute requires the splitting of precincts to achieve districts of equal population.[19]

Lastly, we address ourselves to the charge made by the petitioner that the majority of the commission deliberately devised their adopted plan in such a fashion as to limit the number of black and

[18] In the review of *Muskegon County, supra,* at page 159, the defendant commission argued that variances were justified in order to "avoid the splitting of precincts". This "justification" was rejected under the discussion of the splitting of political subdivisions on page 160 where footnote 2 is of some relevance:

"The desire to preserve artificial and arbitrary political subdivisions is even less convincing in the instant plan where the commission has already *violated boundaries of precincts,* municipalities and townships in at least seven instances to achieve what are still districts of unequal population." (Emphasis added.)

[19] Indeed, in this particular year when congressional districts, both houses of the State legislature, and 83 county boards of commissioners are being reapportioned, precincts are probably the least concern of most of the drafters. Defendant has filed as part of the record in this cause the few letters received from some of the local clerks in Oakland County who took the trouble to respond to the commission's request for advice. These letters show that a majority of those responding were opposed to the splitting of precincts. However, in a year such as this when so many various election districts are undergoing radical change, local election officials must inevitably be pushed to the task of redesigning their administrative units or precincts. True, we are aware that local election officials oppose the work and cost in disturbing their system of administrative units, but they always prove themselves capable of the task of redesigning their system of precincts.

Jewish commissioners that could be elected to the new board. This allegation is not supported by any evidence whatsoever[20] and is wholly controlled by this Court's opinion *In Re Apportionment of Kent County Board of Commissioners—1972,* 40 Mich App 508 (1972).

We hold the apportionment plan adopted by the Oakland County Apportionment Commission to be in violation of the United States Constitution. We remand this matter to the Oakland County Apportionment Commission with express instructions that they draft a new plan for the apportionment of the board of commissioners which shall guarantee to the people of the County of Oakland districts of equal population.

On remand the commission shall meet daily. All proceedings of the commission shall be recorded by means of a verbatim transcript. Additionally, every plan or amendment to an existing plan shall be verified as to the exactness of population and boundaries by the Oakland County Planning Department within 24 hours of submission to the commission. The verification of the planning department must be in the form of a complete verbal description of the boundaries of each district and the population contained within each district. The apportionment commission may not adopt any plan that is not in verified form. The commission shall file a copy of a new plan, together with a separate justification for any population variance in each of the commissioner districts, no matter

---

[20] The total extent of the proof offered by the petitioner is contained on page 13 of his "Brief":

"Finally, although the size of the board is increased by four members over the now existing board, the adopted plan by means of deliberate and unnecessary divisions and combinations of cities, villages and townships, particularly in the cities of Pontiac and Oak Park eliminates the possibility of election of one of the present two Jewish members and one of the present black members of the board."

how small the variance may be, and together with the verbatim transcript of the commission proceedings with the Clerk of the Court of Appeals within ten days from the date of this opinion. In turn, the Clerk of this Court shall forthwith present to this panel for their further review the plan and justification therefor filed by the Oakland County Apportionment Commission, together with any objections that may be filed to the new plan.

## ORDER OF JUNE 7, 1972.

In this cause the Oakland County Apportionment Commission pursuant to the order of this Court, having filed a new plan for the Oakland County Board of Commissioners adopted by unanimous vote on June 1, 1972, and providing for a 27-man board with a zero deviance from districts of mathematically exact population and a statement having been filed by the original petitioner that he has no objections to the plan and in fact expresses his belief that the new plan represents a good-faith effort to achieve population equality and due consideration thereof having been had by the Court; therefore

It is ordered that the plan adopted by the Oakland County Apportionment Commission having mathematically equal districts with no population variance be and the same hereby is declared valid and constitutional for the reason that on the record before us the commission has demonstrated a good-faith effort to achieve districts of equal population.