Patrick A. FLANAGAN, et al., Plaintiffs,

v.

Paul E. GILLMOR, et al., Defendants.

Gary M. STARR, et al., Plaintiffs,

v.

James A. RHODES, Governor, State of Ohio, et al., Defendants.

Nos. C–2–82–173, C–2–82–394.

United States District Court, S.D. Ohio, E.D.

May 25, 1982.

---

William H. Schneider, Thomas M. Herbert, John C. McDonald, Columbus, Ohio, Alan M. Wolk, Cleveland, Ohio, for plaintiffs.

Alvin J. McKenna, Joel S. Taylor, Asst. Atty. Gen. of Ohio, Donald P. Traci, Columbus, Ohio, Russell T. Adrine, Cleveland, Ohio, for defendants.

Before NATHANIEL R. JONES, Circuit Judge, and KINNEARY and DUNCAN, District Judges.

## OPINION

DUNCAN, District Judge.

Plaintiffs and intervenors challenge the constitutionality of the action by the Ohio Legislature in promulgating and passing a congressional redistricting plan subsequently enacted into law by action of the Governor.[1] With due regard for the date of the Ohio primary election, the case has been heard and decided on an expedited schedule.

### Flanagan, et al. v. Gillmor, et al.

On February 16, 1982, Patrick A. Flanagan, a Montgomery County resident, and Ann Butler, a Franklin County resident, filed a class action complaint on behalf of all citizens and electors of the State of Ohio who are qualified to vote for candidates for election to the United States House of Representatives. The complaint alleged that the Ohio General Assembly had failed to enact a law creating the required 21 Congressional districts and requested the Court to establish a constitutional redistricting plan. On March 15, 1982, Chief Judge Edwards of the United States Court of Appeals for the Sixth Circuit designated this panel to hear and determine this action. 28 U.S.C. § 2284(a). On March 24, 1982, the Ohio General Assembly enacted a redistricting plan providing for 21 new Congressional districts. Amended Substitute House Bill No. 20,[2] (hereinafter "the Plan") was signed into law by Governor Rhodes on March 25, 1982.

On March 26, 1982, Juanita C. Brandon and Rose Marie Higenbottam, also Franklin County residents, moved to intervene in this action. The Court granted intervention in an order dated April 6, 1982. The complaint in intervention was styled as a class action and alleged that the recently enacted redistricting plan violated constitutional principles in a number of respects. The plaintiff-intervenors alleged that contrary to the one-person-one-vote principle,[3] the

1. See 2 U.S.C. § 2a.

2. Plaintiffs' Exhibit 7.

3. As discussed below at 47, the one-person-one-vote principle of *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) requires the state to achieve as nearly as practicable equal populations in each of the respective congressional districts.

new districts unjustifiably deviated from the "ideal" population for Congressional districts. The intervenors further alleged that certain of the new Congressional districts had been drawn so as to purposely dilute and deny the voting rights of Ohio's black citizens contrary to the Fourteenth and Fifteenth Amendments to the United States Constitution. The intervenors prayed for a declaratory judgment that the Ohio redistricting plan violated the Constitution of the United States, and for an injunction against the holding of elections pursuant to the plan. The intervenors requested the Court to establish a constitutionally acceptable redistricting plan.

On April 14, 1982, the Court granted the motion of a number of Cuyahoga County residents[4] to intervene as defendants in this action. The Court also determined that this action should proceed on behalf of a class of citizens and electors of the State of Ohio who are qualified to vote for candidates for election to the United States House of Representatives.

Both the original complaint and the intervenors' complaint named as defendants Paul E. Gillmor, President of the Ohio Senate, Harry Meshel, Minority Leader of the Ohio Senate, Vern Riffe, Speaker of the Ohio House of Representatives, Corwin M. Nixon, Minority Leader of the Ohio House of Representatives, James A. Rhodes, Governor of the State of Ohio, and Anthony J. Celebrezze, Jr., Ohio Secretary of State. Pursuant to a stipulation of dismissal filed on April 19, 1982, defendants Gillmor, Meshel, Riffe, and Nixon were dismissed as defendants.

*Starr, et al. v. Rhodes, et al.*

On March 26, 1982, Gary W. Starr, Raymond J. Wohl, Frank D. Castelli, and John Kavlich filed a complaint in the United States District Court for the Northern District of Ohio alleging that the plan violated the one-person-one-vote principle required by the United States Constitution. These plaintiffs further alleged that the Plan created "crazy quilt U.S. Congressional districts in Cuyahoga County, Ohio," for the purpose of protecting two possible candidates for the House of Representatives from the Cuyahoga County area. Plaintiffs asserted that the new Congressional districts violated a claimed constitutional right to "unity of interest" and "convenience of access." Plaintiffs sought a declaratory judgment that the Ohio redistricting plan was unconstitutional and requested the Court to establish a constitutionally acceptable redistricting plan. Named as defendants were Governor Rhodes and Secretary of State Celebrezze.

On April 2, 1982, an amended complaint was filed in the Northern District action adding as additional plaintiffs certain residents[5] of Middleburg Heights and University Heights, Ohio. In addition to the allegations of the original complaint, the amended complaint alleged that the new Congressional districts fragmented "existing political subdivisions through obvious political gerrymandering."

On April 9, 1982, a number of electors[6] from the newly created 21st Congressional District moved to intervene as defendants in the Northern District action. In an order dated April 13, 1982, the three-judge

---

4. The individuals who were granted intervention were Judy Botwin, Barbara H. Boyd, Austin R. Cooper, Russell G. Fox, Cheryle Goode, Joyce Grimes, Terry Meister, Thaddeus Jackson, Eugene Pearson, Dorothy Spiker, Shirley Wilson, and Steve Wortheim, all residents of new Congressional District 21; Carol M. Finnan, John Holleran, Mary Ann Sikorsky and Nancy Toth, residents of new Congressional District 19; and Robert J. Babcock, Susan Birmingham Brooks, David L. Dian, Kenneth Loeri, Robert Rodriguez, Karl Toth, and Rual

Vega, residents of new Congressional District 20.

5. The added plaintiffs were Richard R. Mackay, James J. Modarelli, Beryl E. Rothschild, Jeffrey H. Diredman, M. David Fredman, Leonard Davis, Alan Rutsky, Leonard Vannice, Richard Damiani and Thomas Longo.

6. The intervening defendants were Judy Botwin, Barbara H. Boyd, Austin R. Cooper, Steve Wortheim, Russell G. Fox, Cheryle Goode, Joyce Grimes, Terry Meister, Shirley Wilson,

District Court in the Northern District[7] granted the motion to intervene as defendants and transferred the Northern District action to this Court for the purpose of consolidation with *Flanagan v. Gillmor.* The cases were consolidated and trial began on April 19, 1982, and concluded on April 21, 1982. This matter is now before this three-judge Court for the entry of findings of fact and conclusions of law. Fed.R.Civ.P. 52.

In the discussion that follows, plaintiff-intervenors in the *Flanagan* case and plaintiffs and plaintiff-intervenors in the *Starr* case will be referred to as plaintiffs.

## II

Under the 1970 census, Ohio was entitled to 23 Congressional seats. The 1980 census, however, indicated that Ohio is now entitled to only 21 Congressional seats. Therefore, Congressional redistricting was required for the State of Ohio.

On January 8, 1981, a redistricting plan known as House Bill 20 was introduced in the Ohio House of Representatives. The record is silent with respect to any legislative activity on House Bill 20 until over a year later when, on January 27, 1982, the House Rules Committee reported out the approved Amended Substitute House Bill 20. On that same day, the House approved the Amended Substitute House Bill 20. The Senate version was approved on February 17, 1982. Because of differences between the House and Senate versions, a conference committee was required. A compromise was reached and on March 24, 1982, both houses of the Ohio General Assembly approved the conference committee compromise, the House by a vote of 65 to 30 and the Senate by a vote of 17 to 15. On March 25, 1982, the bill was signed into law by Governor Rhodes.

Thaddeus Jackson, Eugene Pearson, and Dorothy Spiker.

7. The members of the Northern District panel were The Honorable Robert B. Krupansky, Judge of the United States Court of Appeals for the Sixth Circuit, The Honorable George W. White and The Honorable William K. Thomas, United States District Judges in the Northern District.

## A

The Court will turn first to the question of population variances among the new Congressional districts. There is no dispute that according to the 1980 census, the Ohio population is 10,797,630. The ideal population for each of the 21 new Congressional districts is therefore 514,173. All of the new Congressional districts deviate from this ideal. The final version of the bill created the following populations in each of the 21 new Congressional districts.

| | Population | Variation | % Deviation from Ideal |
|---|---|---|---|
| District 1 | 515867 | + 1694 | .33 |
| District 2 | 514408 | + 235 | .05 |
| District 3 | 513588 | − 585 | −.11 |
| District 4 | 514696 | + 523 | .10 |
| District 5 | 514189 | + 16 | .00 |
| District 6 | 514895 | + 722 | .14 |
| District 7 | 512706 | − 1467 | −.29 |
| District 8 | 513427 | − 746 | −.15 |
| District 9 | 514144 | − 29 | −.01 |
| District 10 | 513755 | − 418 | −.08 |
| District 11 | 512867 | − 1306 | −.25 |
| District 12 | 512925 | − 1248 | −.24 |
| District 13 | 515346 | + 1173 | .23 |
| District 14 | 514662 | + 489 | .10 |
| District 15 | 514697 | + 524 | .10 |
| District 16 | 513215 | − 958 | −.19 |
| District 17 | 515223 | + 1050 | .20 |
| District 18 | 514012 | − 161 | −.03 |
| District 19 | 514889 | + 716 | .14 |
| District 20 | 513494 | − 679 | −.13 |
| District 21 | 514625 | + 452 | .09 |
| | 10797630 | | |

| | |
|---|---|
| Ideal population per district | 514,173 |
| Average variation from ideal[8] | .14% |
| Population difference between largest and smallest districts | 3,161 |

The most extreme deviations are found in District 1 (the Western portion of the Cincinnati metropolitan area) and District 7 (a portion of West Central Ohio). District 1 has a population of 515,867, which is 1,694 above the ideal. The percentage deviation

8. Average percentage deviation was calculated by finding the sum of the percentage deviations in each of the Congressional districts, and then dividing that sum by the total number of districts. *Kirkpatrick v. Preisler,* 394 U.S. 526, 529 n. 1, 89 S.Ct. 1225, 1228 n. 1, 22 L.Ed.2d 519 (1969).

from the ideal is +.33%. By contrast, District 7 has a population of 512,706, which is 1,467 below the ideal. The percentage deviation from the ideal is −.29%. The range of deviation between these two extremes is .62%; we refer to this as the total percentage deviation.

In addition to the final version, the Court also received evidence of the versions of the bill as passed by the House,[9] the Senate,[10] and a bill introduced by Senator Meshel.[11] None of these alternatives were better than the final plan with respect to *total* percentage deviation. The House and Meshel versions were better than the final plan in terms of average percentage deviation.[12]

**9.** The House version of the bill created the following populations in each of the 21 proposed Congressional districts.

| | Population | Variation | % Deviation from Ideal |
|---|---|---|---|
| District 1 | 516492 | +2319 | .45 |
| District 2 | 512701 | −1472 | −.29 |
| District 3 | 513588 | − 585 | −.11 |
| District 4 | 514145 | − 28 | −.01 |
| District 5 | 513223 | − 950 | −.18 |
| District 6 | 513312 | − 861 | −.17 |
| District 7 | 514192 | + 19 | .00 |
| District 8 | 514335 | + 162 | .03 |
| District 9 | 513413 | − 760 | −.15 |
| District 10 | 514746 | + 573 | .11 |
| District 11 | 514905 | + 732 | .14 |
| District 12 | 514482 | + 309 | .06 |
| District 13 | 514251 | + 78 | .02 |
| District 14 | 514662 | + 489 | .10 |
| District 15 | 514692 | + 519 | .10 |
| District 16 | 514283 | + 110 | .02 |
| District 17 | 514449 | + 276 | .05 |
| District 18 | 514555 | + 382 | .07 |
| District 19 | 513411 | − 762 | −.15 |
| District 20 | 514056 | − 117 | .02 |
| District 21 | 514169 | − 4 | .00 |
| Ideal population per district | 514,173 | | |
| Average variation from ideal | .11% | | |
| Population difference between largest and smallest districts | 3,791 | | |

**10.** The Senate version would have resulted in the following populations.

| | Population | Variation | % Deviation from Ideal |
|---|---|---|---|
| District 1 | 516735 | +2562 | .50 |
| District 2 | 515815 | +1642 | .32 |
| District 3 | 513615 | − 558 | −.11 |
| District 4 | 514132 | − 41 | −.01 |
| District 5 | 515583 | +1410 | .27 |
| District 6 | 513041 | −1132 | −.22 |
| District 7 | 512708 | −1465 | −.28 |
| District 8 | 513910 | − 263 | −.05 |
| District 9 | 514888 | + 715 | .14 |
| District 10 | 514281 | + 108 | .02 |
| District 11 | 514010 | − 163 | −.03 |
| District 12 | 511841 | −2332 | −.45 |

| | Total Percentage Deviation | Average Percentage Deviation |
|---|---|---|
| Final Version of House Bill 20 | .62% | .14% |
| Senate Version | 1.03% | .23% |
| House Version | .74% | .11% |
| Meshel Version | .74% | .11% |

In Districts 12 and 15, for example, earlier versions resulted in the following statistics:

Deviations from the Ideal Population

| | Final | House | Senate | Meshel |
|---|---|---|---|---|
| District 12 | − 1248 | + 309 | − 2332 | + 381 |
| District 15 | + 524 | + 519 | + 1194 | + 447 |

| | Population | Variation | % Deviation from Ideal |
|---|---|---|---|
| District 13 | 511425 | − 2748 | −.53 |
| District 14 | 513783 | − 390 | −.08 |
| District 15 | 515367 | + 1194 | .23 |
| District 16 | 513278 | − 895 | −.17 |
| District 17 | 514141 | − 32 | −.01 |
| District 18 | 514425 | + 252 | .05 |
| District 19 | 511964 | − 2209 | −.43 |
| District 20 | 516247 | + 2074 | .40 |
| District 21 | 516451 | + 2278 | .44 |
| Ideal population per district | 514,173 | | |
| Average variation from ideal | .23% | | |
| Population difference between largest and smallest districts | 5,310 | | |

**11.** The Meshel version would have resulted in the following populations.

| | Population | Variation | % Deviation from Ideal |
|---|---|---|---|
| District 1 | 516492 | 2319 | .45 |
| District 2 | 512701 | −1472 | −.29 |
| District 3 | 513588 | − 585 | −.11 |
| District 4 | 514145 | − 28 | −.01 |
| District 5 | 513223 | − 950 | −.18 |
| District 6 | 513312 | − 861 | −.17 |
| District 7 | 514192 | 19 | .00 |
| District 8 | 514335 | 162 | .03 |
| District 9 | 513413 | − 760 | −.15 |
| District 10 | 514746 | 573 | .11 |
| District 11 | 513637 | − 536 | −.10 |
| District 12 | 514554 | 381 | .07 |
| District 13 | 514251 | 78 | .02 |
| District 14 | 514662 | 489 | .10 |
| District 15 | 514620 | 447 | .09 |
| District 16 | 514283 | 110 | .02 |
| District 17 | 514449 | 276 | .05 |
| District 18 | 514555 | 382 | .07 |
| District 19 | 513824 | − 349 | −.07 |
| District 20 | 515017 | 844 | .16 |
| District 21 | 514073 | − 100 | .02 |
| Ideal population per district | 514,173 | | |
| Average variation from ideal | .11% | | |
| Population difference between largest and smallest districts | 3,791 | | |

**12.** *See note 8, supra.*

Although some earlier versions of the bill more closely approximated the ideal in particular districts, the General Assembly and this Court must consider the plan as a whole. Viewed in totality, the plan as enacted compares favorably to the other proposed plans.

As revealed by the above figures, the General Assembly did not achieve precise mathematical equality. After consideration of the evidence of record, the Court concludes that several factors affected the General Assembly's efforts to achieve the ideal. First, the process of legislative compromise, which involved a number of ingredients, all primarily governed by the political complexion of the Ohio Legislature, influenced efforts to achieve the ideal. Among these to a greater or lesser extent were efforts to preserve the core of existing Congressional districts, to achieve relative geographic compactness, and to preserve the political complexion of the districts of incumbent members of the Congressional delegation. In addition, the designers of the plan gave special consideration to maintaining favorable district constituencies for Representative Louis Stokes, Ohio's only black member of the Congressional delegation, and Representative Rose Oakar, the only woman member of the Ohio Congressional delegation.

Plaintiffs also introduced evidence that the unit of measurement employed by those responsible for drawing the lines influenced efforts to achieve the ideal. The General Assembly had available at least two units of measurement as a result of the 1980 census compilations. Census figures were available for both census tracts and census blocks, at least in urban areas. Census tracts are the larger unit of measurement and census blocks are the smaller. By utilizing census blocks, a greater degree of mathematical precision was possible.[13] For example, if two contiguous proposed districts varied from the ideal population, one on the positive side and one on the negative side, the use of a smaller unit of measurement would enable a more precise readjustment of the populations of the two contiguous districts. In spite of the relative precision of the census block unit the plan as enacted primarily employed the use of census tracts. In support of this choice, defendants offered testimony that the risk of error in population calculations is increased by use of census blocks. While it may be true that this risk is enhanced by the use of census blocks, the Court finds no evidence of record that this potential for error could not have been compensated for by more precise methods of review. Moreover, as revealed by the testimony of the Senate Clerk, Mr. James Tilling, census blocks were utilized in some instances.

The evidence also suggests that less hurried final action by the General Assembly would have permitted greater mathematical precision. Mrs. Edith Woodward, a Librarian for the Ohio Legislative Service Commission who played a significant role in drafting the new district lines, candidly admitted that with more time a better effort to achieve precise mathematical equality could have been made.

### B

Plaintiffs also contend that the Ohio General Assembly purposely diluted the voting strength of Ohio's black citizens. At trial, the evidence focused on the black populations of Franklin, Hamilton and Cuyahoga Counties. The testimony of a number of witnesses involved in the redistricting process reveals that at the time the process began, some consideration was given to the black vote. The Senate Clerk, Mr. James Tilling, testified that he utilized a computer printout indicating racial populations throughout Ohio as well as other demographic and political information. Tilling learned from review of this printout that

---

**13.** The evidence at trial was inconclusive on the issue of whether greater precision could have been obtained solely by reallocation of census tracts between districts.

the only geographic area in Ohio which would permit a "safe" black district was the area currently served by the incumbent, Louis Stokes. According to Tilling, no other metropolitan area had a sufficient black population to ensure the election of a black representative. There is no evidence in the record to the contrary.

Plaintiffs' claims concerning dilution of the black vote involve Hamilton County in which the City of Cincinnati is located and Franklin County in which the City of Columbus is located. The great bulk of the evidence concerned Franklin County which contains part of Districts 12 and 15. According to plaintiffs' evidence, the black population of Franklin County is 131,016.[14] Under the new Plan, approximately 58% of Franklin County's black population is in the 12th District and approximately 42% is in the 15th District. Of the total population in the 12th District, 15.1% is black. Similarly, of the total population of the 15th District, 11% is black. Through the testimony of Dr. Herbert Asher, a political scientist, plaintiffs suggested boundary lines for the 12th and 15th Districts which would have resulted in placing 82% of the black population in the 12th District and 18% in the 15th District.

Some historical perspective is helpful. The boundary line between the 12th and 15th Districts which was established by 1970 ran in a north-south direction through the approximate middle of Franklin County and the City of Columbus.[15] Under the 1970 plan, the black population of Franklin County was divided between the old 12th and 15th Districts. No evidence whatsoever was presented as to the legislative line drawing in the 1970 census redistricting process.

Under the new plan, the significant change occurred in the portion of the boundary line near downtown Columbus.[16] At that point, the new line meanders in a generally eastward direction rather than proceeding southward as had the old line.

During the 1970's, the increase in the Franklin County black population was primarily in the area of the old 12th District. Thus, if the line between the 12th and 15th Districts had remained substantially unchanged in the portion south of downtown Columbus, the black population would have constituted a slightly greater percentage of the new 12th District.

The realignment of the boundary between the 12th and 15th Districts did not significantly alter the percentage of blacks in either the 12th or 15th Districts relative to the old plan. Certain predominantly Democratic and predominantly black wards in the southeast quadrant of Columbus were shifted from the 12th to the 15th District. In the near north side of Columbus, the boundary between the 12th and 15th Districts was shifted to the west. As a result, some census tracts with a significant Democratic and black population were shifted from the 15th District to the 12th District. These two major shifts in the boundary line tended to offset each other with respect to total black population. However, there was evidence that the voter turn out of the first mentioned wards was greater than that of the second. The 12th Congressional District is presently represented by a Democrat, the 15th by a Republican. Under the old plan, the 12th District black population was 15.24% and under the new plan the population was 15.13%,[17] a total loss of 943 blacks from the 12th District. Under the old 15th District plan, the black population is 11.82% and under the new plan the population is 11.01%.

The Court also finds, based upon the credible testimony of Representative Michael Stinziano, that members of the General Assembly in a position to effect the final placement of the boundary between the 12th and 15th knew that the line as drawn in the final version divided the black community between the 12th and 15th Districts.

14. Plaintiffs' Exhibit 16.

15. Plaintiffs' Exhibit 25.

16. *Id.*

17. Plaintiffs' Exhibit 17.

The evidence with respects to Districts 1 and 2 including Hamilton County is quite sparse, although the evidence suggests that the boundary line between Districts 1 and 2 was not drawn so as to maximize the black voting strength in a single district.

The new boundary lines in other urban areas of the state produced results dissimilar to the situations in Columbus and Cincinnati where the district lines divided the black community. In Cuyahoga County, black residents of the 21st Congressional District comprise a majority of the District's population as well as the majority of the black population of that county. Congressional Districts 3 and 9, which include the entire metropolitan area of the City of Toledo and the City of Dayton, respectively, appear to contain all of the black residents of those cities as well.[18]

We now turn to the applicable legal standards.

### III

### A

■ We first consider the standards applicable to the claim of race discrimination. Plaintiffs' burden in proving unconstitutional discrimination in violation of the equal protection clause of the Fourteenth Amendment or of the Fifteenth Amendment is satisfied only by proof of an impermissible racially motivated redistricting plan. *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 62–68, 100 S.Ct. 1490, 1497–1500, 64 L.Ed.2d 47 (1980); *Wright v. Rockefeller,* 376 U.S. 52, 56–57, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960); *see White v. Regester,* 412 U.S. 755, 765–70, 93 S.Ct. 2332, 2339–41, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971); *Burns v. Richardson,* 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376 (1966). Proof of discrimination need not be direct; it may be inferred when the circumstances are such as to justify the

conclusion that invidious discrimination was more likely than not a motivating factor in the redistricting decision; *see, e.g., City of Mobile v. Bolden, supra; White v. Regester, supra.* However, the mere showing of awareness that a decision would affect minorities is insufficient. "[Discriminatory purpose] implies that the decision maker ... selected or reaffirmed a particular course of action at least in part, 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *City of Mobile v. Bolden,* 446 U.S. at 72, n. 17, 100 S.Ct. at 1502, n. 17.

■ In our view, the evidence fails to establish an invidiously discriminatory racial motive accounting in whole or in part for the district boundaries. To begin, we note that no proof of past discriminatory practices was presented. Thus, the question of present effects of past discrimination and the duties and obligations of the state in such circumstances need not detain us for that question is not presented on these facts. Our concern is directed to the 1980 redistricting plan.

As noted above, the black population of Franklin County was insufficient to establish a "safe" black district. Plaintiffs introduced evidence which indicated that the political influence of the black population of Franklin County would be enhanced by including a greater percentage of the black population in the 12th District. Plaintiffs contend that this failure to maximize the voting strength of the black population was a purposeful dilution of the black vote.

■ The evidence established that the drafters of the plan, both Democratic and Republican, were aware of the location of significant black neighborhoods in the Columbus and Cincinnati metropolitan areas. However, the awareness of the location and number of racial or ethnic populations in the state or a district does not, in itself, yield a constitutional violation when such a community is divided between two districts by state legislative reapportionment. *See*

---

**18.** This information is gleaned from the 1980 Census of Population and Housing (PHC80 V-·

37, Advance Report, March 1981) introduced in this case as Plaintiffs' Exhibit 9.

*City of Mobile v. Bolden,* 446 U.S. at 72, n. 17, 100 S.Ct. at 1502, n. 17. The fact that a skilled politician knows the demographics of a geographical area imposes no more obligation upon the better-informed legislator than that imposed upon his less-informed colleague. For both, it must be shown that redistricting action resulted in part because of an invidiously discriminatory motive or intent.

■ We find that the evidence neither directly proves nor justifies an inference of invidious discrimination in the drawing of the boundaries of Districts 12 and 15.[19]

■ The Court finds no evidence that the location of the line is attributable to any racially invidious purpose. Rather, the most persuasive evidence establishes that political compromise resulted in the location of the boundary between the 12th and 15th Districts. The congressman from the old District 15 is a Republican; the congressman from the old District 12 is a Democrat. Both Republicans and Democrats were seeking political leverage for the 1982 congressional elections and they focused on the line dividing the two districts through the City of Columbus. In negotiations concerning the location of the boundary between the 12th and the 15th, members of the General Assembly from Franklin County were aware of the political complexion of certain key wards close to the boundary line. The subsequent compromise resulted in a number of democratic voting wards being shifted into District 15 because of political considerations and not "because of" a racially invidious purpose. *See City of Mobile v. Bolden,* 446 U.S. at 72, n. 17, 100 S.Ct. at 1502, n. 17. The evidence plainly and overwhelmingly demonstrated that apart from the constraint of the one-person-one-vote rule, the primary aim of each party was to elect more of their members to the Congress of the United States. Both the lines proposed originally and the final compromises expressed in the plan were demonstrated to result from the "rough and tumble" of party politics rather than from racial animus.[20]

In the related context of line drawing for state legislative boundaries, the Supreme Court has stated:

> We are quite unconvinced that the reapportionment plan offered by the three-member Board violated the Fourteenth Amendment because it attempted to reflect the relative strength of the parties in locating and defining election districts. It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary. See *White v. Regester, supra; Burns v. Richardson, supra; Whitcomb v. Chavis, supra; Abate v. Mundt, supra* [403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971)]. The very essence of districting is to produce a different—a more "politically fair"—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than

---

19. While plaintiffs-intervenors also alleged invidious discrimination in the lines drawn between Districts 1 and 2 in Hamilton County, no evidence beyond the division of predominantly black residential communities by the voting boundaries was shown. From such testimony alone, unconstitutionally discriminatory reapportionment practices may not be inferred.

20. We do not mean to imply that we are unconcerned if the General Assembly in enacting a redistricting plan uses racial demography as a factor in considering the political complexion of a district, and the result is a significant diminution of black voting power. Under such circumstances a permissible inference of purposeful discrimination could be drawn. In the evaluation of the proof presented we simply conclude that the evidence does not justify the inference that race has been impermissibly used in this case.

another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences. *Gaffney v. Cummings,* 412 U.S. 735, 752–53, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973); *see Kirkpatrick v. Preisler,* 394 U.S. 526, 531–32, 534 & n. 4, 89 S.Ct. 1225, 1229, 1230 & n. 4, 22 L.Ed.2d 519 (1969).

This conclusion that no impermissible racial motivation accounted for district line drawing by the drafters of Amended Substitute House Bill 20 is bolstered by the bipartisan efforts to avoid diluting black voting power in the redistricting of the northeastern Ohio area, necessitated by lost population and requiring the deletion of one congressional seat. *See White v. Regester,* 412 U.S. 755, 765–70, 93 S.Ct. 2332, 2339–41, 37 L.Ed.2d 314 (1973); *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965); *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1963); *In re Illinois Congressional Districts Reapportionment Cases,* (No. 81C 3965, N.D.Ill.1981), *aff'd mem sub nom. Ryan v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982). Such action by the Ohio Legislature in creating the new 21st Congressional District from the old 21st District, now represented by Congressman Louis Stokes, further tends to weaken any support for the inference plaintiffs ask us to draw that district lines elsewhere were drawn in part because of unconstitutional racial purpose by the General Assembly. While unconstitutional action need be shown in the drawing of only one district to yield a finding of unconstitutionality, the absence of divisions by district lines in the substantial black populations of Congressional Districts 3 and 9 further rebuts the proffered inference that the General Assembly acted in violation of the Fourteenth or Fifteenth Amendments. We find and hold that it did not.

■ Plaintiffs-intervenors of the City of University Heights (University Heights) claim that in dividing that city along census tract boundaries, the General Assembly engaged in unconstitutional gerrymandering. University Heights recognizes that in drawing district boundaries, the legislature is not required by the Constitution to respect the borders of political subdivisions. To the contrary, undue legislative respect for municipal boundaries may result in an impermissible violation of the one-person-one-vote principle. *Kirkpatrick v. Preisler,* 394 U.S. 526, 533–34, 89 S.Ct. 1225, 1230, 22 L.Ed.2d 519 (1969). University Heights argues nonetheless that the General Assembly unlawfully split the city's "community of interest," which includes a large number of Jewish voters.

■ As we have already stated, gerrymandering motivated in part by invidious discrimination is constitutionally condemned. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). We find no evidence, however, that in dividing the 19th from the 21st District in part between the two census tracts which together include University Heights, the General Assembly was animated by a purpose to dilute the ability of voters to organize along religious or racial lines. We therefore reject the University Heights claim.

B

Article I, Section 2 of the Constitution of the United States provides in part:

The House of Representatives shall be composed of Members chosen every second Year by the People of the several states . . . .

In *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–530, 11 L.Ed.2d 481 (1964), the Supreme Court held that

[C]onstrued in its historical context, the command of Art. I, § 2, that Representatives be chosen "by the People of the several states" means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's. (Footnote omitted.)

This one-person-one-vote principle has been steadfastly followed in subsequent Supreme Court decisions concerning Congressional redistricting. In *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the Court was faced with a challenge to Missouri's Congressional redistricting plan where "the most populous district was 3.13% above the mathematical ideal, and the least populous was 2.84% below." *Id.* at 528–29, 89 S.Ct. at 1227–28. The average variation from the ideal was 1.6%. *Id.* at 529, n. 1, 89 S.Ct. at 1228, n. 1. In finding these deviations unacceptable, Justice Brennan wrote:

We reject Missouri's argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy without question the "as nearly as practicable" standard. The whole thrust of the "as nearly as practicable" approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case. The extent to which equality may practicably be achieved may differ from State to State and from district to district. Since "equal representation for equal numbers of people [is] the fundamental goal for the House of Representatives," *Wesberry v. Sanders, supra* [376 U.S.], at 18 [84 S.Ct. at 535] the "as nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical equality. See *Reynolds v. Sims,* 377 U.S. 533, 577 [84 S.Ct. 1362, 1389, 12 L.Ed.2d 506] (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

*Id.* at 530–531, 89 S.Ct. at 1228–29.

As we have set forth *ante* at 42, the Legislature could have attained greater precision; the variances were not shown to be unavoidable. In *Kirkpatrick* such a finding disposed of the good faith issue. *See Id.* at 531–32, 89 S.Ct. at 1229. There the State of Missouri sought to justify the deviations from the ideal by reference to a number of non-numerical factors which have also been mentioned in the evidence before this Court. The majority opinion rejected all of the proffered justifications. First, the Court found efforts to avoid the fragmentation of areas with distinct economic and social interests to be "antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people." 394 U.S. at 533, 89 S.Ct. at 1230. Second, the Court rejected the assertion that inevitable legislative interplay could "justify an apportionment which does not otherwise pass constitutional muster." *Id.* Third, the State's argument that deviations from the ideal which were attributable to attempts to avoid fragmenting political subdivisions was also found unworthy of merit. *Id.* at 533–34, 89 S.Ct. at 1230. Efforts to achieve geographical compactness were likewise dismissed as a permissible justification for deviations. *Id.* at 535–36, 89 S.Ct. at 1231.

Thereafter, the Court decided *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), in which the Court reaffirmed the *Kirkpatrick* demand for good faith efforts to achieve absolute equality. *Id.* at 790, 93 S.Ct. at 2352. In *White,* the Court struck down a Texas congressional redistricting plan in which the most populous district "exceeded the ideal district by 2.43%" and the least populous district "was smaller by 1.7%." *Id.* at 785, 93 S.Ct. at 2350. "The average deviation of all districts from the ideal . . . was .745% or 3,421 persons." *Id.* The Court reaffirmed its earlier views that such deviations could not be justified by efforts to respect existing political boundaries.

In the case before us, the evidence establishes that several of the non-numerical justifications rejected by the *Kirkpatrick*

Court affected the efforts to achieve precise mathematical equality. A review of the map of the new Congressional districts reveals that efforts to follow political subdivisions, particularly township lines, coupled with a reluctance in urban areas to use census blocks rather than census tracts contributed to the General Assembly's failure to more closely approximate the mathematical "ideal."

Nevertheless, the Court has substantial doubt as to whether the consideration of non-numerical factors in this case is constitutionally impermissible where the percentage deviation is arguably of no statistical significance. Census data itself is acknowledged to deviate from the actual figures by total percentage deviation in the range of two percentage points. *See Daggett v. Kimmelman,* 535 F.Supp. 978 (D.N.J.1982) (Gibbons, dissenting and citing Bureau of Census, Current Population Reports, Special Studies, Coverage of Population in the 1970 Census and Some Implications for Public Programs (August 1975)). Both the total percentage deviation and average percentage deviation in the cases before the Court in *Kirkpatrick, Wells* and *White* were greater than the comparable figures in this case.

We also note with interest the recent decision of the United States District Court for the Northern District of Illinois in *In re Illinois Congressional Districts Reapportionment Cases* (No. 81C–3965 N.D.Ill.1981), *aff'd mem sub nom. Ryan v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (January 11, 1982), in which the Court was required to select a suitable plan because of the Illinois legislature's failure to enact a plan. In that case, the three-judge district court read the *White v. Weiser* decision as signaling some deference to state policy in designing a redistricting plan. For authority the Illinois court noted the Supreme Court's emphasis in *White* upon the alternative plan (B) which most closely approximated the legislative will while correcting the pop-

ulation disparities. The fact that Plan B also more closely approximated the ideal than that plan adopted by the district court was not given prominence in the Supreme Court's discussion. See 412 U.S. at 795–97, 93 S.Ct. at 2354–55. The Illinois court stated:

> By such analysis, mathematical equality in this case [*White v. Weiser*] appears to have taken a secondary role to adherence to, or reflection of, state policy as expressed by the legislature.

Slip Opinion, at 11.[21]

A recent New Jersey redistricting case also raises a question concerning the *Kirkpatrick* requirement of precise mathematical equality. In *Daggett v. Kimmelman, supra,* the district court was presented with a legislatively enacted redistricting plan with a total percentage deviation of .6984%. Alternative plans considered by the legislature had smaller total percentage deviation: the amended Reock plan—.2960%; the DiFrancesco plan—.1253%; and the Hardwick plan—.4515%. In addition, two other plans with lesser deviations were introduced in the New Jersey legislature after the passage of the final bill. Declaring the legislative plan unconstitutional, the district court in a 2–1 decision concluded that:

> P.L. 1982, c. 1 can withstand constitutional attack only if the population variances are "unavoidable despite a good-faith effort to achieve absolute equality, or . . . [if] justification is shown." *Kirkpatrick,* 394 U.S. at 531 [89 S.Ct. at 1229]. It is clear that the .6984% population deviation of P.L. 1982, c. 1 is not unavoidable. The legislature had the option of choosing from several other plans with a lower total deviation than .6984%.

Judge Gibbons, however, dissented because of his conclusion that the relatively minor deviation from the ideal was statistically insignificant. He explained:

> Thus the *Kirkpatrick v. Preisler* rule is one implied from the clause in Article I of the Constitution apportioning representa-

---

21. At least one lower court decision has approved redistricting plans with deviations in the range now before the Court. *See West*

*Virginia Civil Liberties Union v. Rockefeller,* 336 F.Supp. 395 (S.D.W.Va.1972).

tion in the House of Representatives in accordance with the constitutionally mandated decennial census. The basic purpose of that clause is to prevent disparities in representation among the states. Even for that purpose the constitutionally mandated decennial census measurement is imprecise. It is no less so when the same measurement is used for districting within a state.

It is conceivable that the Court would hold that only such imprecision as is built into the constitutional standard is tolerable, and no more. The Court has not done so. Instead it has suggested that some justification for variances may be advanced. It seems to me, therefore, that the rule must be that variances may be justified which do not achieve statistically significant dilutions of the relative representation of voters in larger districts when compared with that of voters in smaller districts. I would read the de minimum language in *Kirkpatrick v. Preisler* as a prohibition against toleration of de minimum dilutions of relative representation rather than as a prohibition against toleration of de minimum population variances which have no statistically relevant effect on relative representation. A plus-minus deviation of 0.6984% falls within the latter category.

. . . . .

A deviation in population between the largest and the smallest district of 0.6984% is smaller than the recognized margin of undercounting in the census. I would hold that achievement of that small a deviation demonstrates as a matter of law a good faith effort to achieve equal member districts.

After the District Court enjoined the state officers from conducting elections pursuant to the legislatively enacted plan, the defendants sought a stay from Justice Brennan, the Circuit Justice for the Third Circuit. In an in-chambers opinion Justice Brennan phrased the issue:

The appeal would thus appear to present the important question whether *Kirkpatrick v. Preisler* requires adoption of the plan that achieves the most precise mathematical exactitude, or whether *Kirkpatrick* left some latitude for the New Jersey legislature to recognize the considerations taken into account by it as a basis for choosing among several plans, each with arguably "statistically insignificant" variances from the constitutional ideal of absolute precision.

*Karcher v. Daggett,* 455 U.S. 1303, 102 S.Ct. 1298, 71 L.Ed.2d 635 (1982). After analyzing the appropriate considerations applicable to a request for stay, Justice Brennan concluded:

[I]t does seem to me that there is a reasonable probability that jurisdiction of the appeal will be noted, and that there is fair prospect of reversal.

*Id.* The stay was granted by Justice Brennan and the full Court declined an opportunity to vacate the stay. *Karcher v. Daggett,* 456 U.S. 901, 102 S.Ct. 1745, 72 L.Ed.2d 157 (1982).

It is extremely difficult to distinguish the fundamental issue at stake in the New Jersey case from that in the case at bar. The New Jersey deviation was .6984%; the Ohio deviation is .62%. The failure to achieve precise mathematical equality in the New Jersey redistricting law was attributable to political concerns, to preservation of cores of preexisting districts, to efforts at maintaining municipal and county boundary lines, and to preservation of the districts of Democratic incumbents. *See Daggett v. Kimmelman, supra,* 535 F.Supp. at 982. Similar considerations were intertwined in the compromise which led to the enactment of the Ohio plan. The Supreme Court's decision in the New Jersey case may well be dispositive of the mathematical precision issue raised in this case.

In light of this uncertainty in the law, we must consider the appropriateness of plaintiffs' request that we enjoin elections under the plan. Ohio's primary elections are scheduled for June 8, 1982. The Secretary of State has produced uncontradicted testimony that a lead time of approximately 45 days is necessary to fulfill requirements for the preparation of a new primary. A spe-

cial election would cost Ohio taxpayers approximately 4.6 million dollars.

 Moreover, this Court is mindful that this plan is the product of the elected representatives of Ohio citizens. On the facts here presented, we believe that deference to the legislatively enacted plan is appropriate because there is doubt as to the controlling constitutional standard.

We also note that the Supreme Court has permitted

> elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. See, e.g., Bullock v. Weiser, 404 U.S. 1065 [92 S.Ct. 750, 30 L.Ed.2d 752] (1972); Whitcomb v. Chavis, 396 U.S. 1055 [90 S.Ct. 748, 24 L.Ed.2d 757] (1970). Necessity has been the motivating factor in these situations.

Upham v. Seamon, 456 U.S. 37, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982). We accordingly will hold in abeyance the issue of whether the Ohio plan satisfies the mathematical precision requirement of Kirkpatrick, supra, until we have had the benefit of the Supreme Court's decision in the New Jersey case. Employing the traditional equitable tests, with particular concern for the public interest, we conclude that plaintiffs' request that the Court enjoin the holding of the June 8, 1982 primary election for the House of Representatives pursuant to the Ohio plan must be DENIED.

## ORDER

In accordance with an opinion simultaneously filed herein and for the reasons therein stated, the Court concludes that plaintiffs have failed to prove that Ohio's black citizens were the victims of purposeful discrimination in the drawing of Congressional District Lines in Amended Substitute House Bill 20. The Court will hold in abeyance the issue of whether the new plan is consistent with the Kirkpatrick requirement of precise mathematical equality until the Court has had the benefit of the Supreme Court's final decision in the New Jersey redistricting case or until further order of the Court.