**Decided October 6, 1983**

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

APPELLATE DIVISION

GREGORIO C. SABLAN, JUAN T.      )      CIVIL ACTION NO. 83-9014
GUERRERO and ANTONIO M.          )
CAMACHO,                         )
                                 )
         Petitioners,            )
                                 )
            vs.                  )      MEMORANDUM OPINION
                                 )
THE NORTHERN MARIANA ISLANDS     )
BOARD OF ELECTIONS,              )
                                 )
         Respondent.             )
_____)

Before:   Judges LAURETA, SOL',* and GIANOTTI*

Per Curiam:

MEMORANDUM OPINION

         The Petitioners filed a Petition in the Appellate Divi-
sion of this Court on September 20, 1983 seeking a determination
of the constitutionality of H.B. 315 which, prior to hearings on
this matter, became Public Law 3-78.

         Respondent filed its opposition on September 27, 1983
refuting Petitioners' claims and seeking dismissal of the Petition.

         Trial was had before a three-judge panel of the Appellate
Division of this Court, pursuant to Section 4(b) of Article II,
of the Constitution of the Commonwealth of the Northern Mariana
Islands, on September 28 and 29, 1983.

_ _ _ _ _ _ _ _ _

*Designated Judges sitting pursuant to 48 U.S.C. § 1694(b).

On September 30, 1983, we issued our decision dismissing the Petition wherein we stated that a memorandum opinion would be issued thereafter setting forth the reasons underlying the Court's decision. This memorandum opinion serves that stated purpose.

## I. STATEMENT OF THE FACTS/CASE

The Constitution of the Commonwealth of the Northern Mariana Islands (CNMI) provides for a bicameral legislature. Article II, § 1. The Senate consists of nine members, three each from the islands of Saipan, Rota and Tinian.[1] The House of Representatives now sitting consists of fourteen members, one each from Rota and Tinian and twelve from Saipan. It is the system of electing the House members which is the focus of this action.

The CNMI Constitution sets forth the basic system of representation.[2] Representatives are to be chosen from districts; Rota and Tinian are each one district and Saipan is divided into six districts. Section 11 of the Schedule on Transitional Matters

— — — — — — — — —

[1] Article II, § 2. Actually, the second senatorial district consists of Tinian and Aguiguan and the third senatorial district consists of Saipan and the islands north of it. For convenience, when we refer to Tinian, we include Aguiguan and when we refer to Saipan, we include the islands to the north.

[2] The relevant parts of Article II, Section 3 provide:

Section 3: Composition of the House of Representatives:

a) The house of representatives shall consist of fourteen members with twelve members elected from Saipan and the islands north of it, one member elected from Rota and one member elected

(in the NMI Constitution) defines the districts to be used for the purposes of electing the twelve representatives from Saipan.[3/] The election districts are defined by reference to municipal districts or enumeration districts or a combination thereof.[4/] The House members for the first three Commonwealth legislatures were elected from the districts as defined in Section 11.

Section 4 of Article II provides for the periodic reapportionment of the seats and/or redistricting of the districts of the House.[5/] At least every ten years and following every deccenial census, the legislature is to reapportion and/or redistrict to provide each member of the House with approximately the same number of residents to the extent permitted ly three constraints:

— — — — — — — — — —

from Tinian and Aguiguan.  The number of representatives may be increased by law to not more than twenty.  The term of office for representative shall be two years.

b) For purposes of electing representatives Rota shall constitute one district, Tinian and Aguiguan shall constitute one district, and Saipan and the islands north of it shall constitute six districts.  The legislature may change the number and boundaries of these districts only pursuant to its duties under section 4 of this article.  When the population of the islands north of Saipan equals or exceeds the number of persons represented by any member of the house or representatives these islands shall constitute a separate district electing one representative.

[3/] Section 11.  Saipan Election Districts.  For the purpose of electing twelve members of the house of representatives from Saipan under article II, section 3, Saipan shall be divided into the following six election districts:

first district: municipal districts six and ten,

745

(1) the House may have no more than twenty members; (2) the districts are not to encompass more than one island[6]; and (3) the districts must remain compact and contiguous.[7]

The legislature has 120 days "following the publication of the results of the decennial census" to reapportion and/or redistrict.[8] If the legislature fails to act, the governor shall have an additional 120 days to promulgate a plan. Should the governor fail to act, the Commonwealth Appeals Court shall establish a plan.[9]

---------

electing two representatives;

second district: municipal district four plus census enumeration district thirty-eight, electing one representative;

third district : municipal districts two and five plus census enumeration district thirty-one, electing two representatives;

fourth district: census enumeration districts twenty-nine, thirty and thirty-seven, electing one representative;

fifth district: municipal districts seven and eleven plus the islands north of Saipan minus census enumeration district eleven, electing four representatives;

sixth district: municipal districts eight and nine plus census enumeration district eleven, electing two representatives.

These elections districts shall remain in effect until otherwise provided by law enacted under the Constitution.

[4] Each municipal district is composed of two or more census enumeration districts.

[5] Section 4: Reapportionment and Redistricting:

The results of the 1980 Census were released by the Bureau of the Census (Bureau) in stages. In November of 1982, the Bureau printed and sent to the CNMI Department of Commerce and Labor (DCL) the data indicating the population of the CNMI by municipal districts. This information was received in January of 1983. On June 20, 1983, DCL received a computer printout from the Bureau detailing the population statistics by enumeration districts. A "cover-letter" certifying the data as official Bureau statistics was requested by DCL and received on August 19, 1983.

_ _ _ _ _ _ _ _ _ _

a) At least every ten years and within one hundred twenty days following publication of the results of a decennial census, the legislature shall reapportion the seats in the house of representatives as required by changes in Commonwealth population or by law. A reapportionment or redistricting plan shall provide for contiguous and compact districts and for representation by each member of the house of representatives of approximately the same number of residents to the extent permitted by the separate islands and the distribution of population in the Commonwealth.

b) If the legislature fails to act pursuant to section 4(a), the governor shall promulgate a reapportionment or redistricting plan within one hundred twenty days after the expiration of the time for the legislature to act. The governor's plan will be published in the same manner as an act of the legislature and upon publication shall have the force of law. Upon the petition of any person qualified to vote, the Commonwealth appeals court or the United States District Court if no Commonwealth appeals court has been created under section 3 of article IV has original and exclusive jurisdiction to review a plan and to amend it to comply with the requirements of this Constitution or to establish a plan if the governor has failed to act within the time provided.

The results of the 1980 Census showed significant population changes within the Commonwealth. The legislature set out to reapportion and redistrict, resulting in the enactment of Public Law 3-78 (P.L. 3-78) on September 22, 1983. P.L. 3-78 repealed Section 11 and replaced the former six districts with four new districts. In addition, Saipan was to receive an additional representative, bringing the Saipan total to thirteen. The new districts were all multi-member districts ranging from a minimum of two representatives in the Fourth District to a maximum of five representatives in the Third District. The new district lines followed municipal district boundaries with the exception of the Third District which lost enumeration district 11 to the Fourth District. Rota and Tinian each kept one Representative.[10/]

- - - - - - - - - -

[6/] Analysis of the Constitution of the Northern Mariana Islands, pp. 46-47.

[7/] Article II, § 4(a)

[8/] Article II, § 4(b)

[9/] It is undisputed by the parties that the "Commonwealth Appeals court" referred to in § 4(b) is the Appellate Division of the District Court for the Northern Mariana Islands. See Analysis, p. 49.

[10/] Although P.L. 3-78 did not mention Rota or Tinian, these two islands each receive one member under § 3(a) of the Constitution unless increased by the legislature.

The deviation percentages under P.L. 3-78 are as follows:

| Election District | Population | Number of Representatives | Percentage Deviation |
|-----------|-----------|--------------------------|----------------------|
| 1 | 3318 | 3 | 1.162 |
| 2 | 3400 | 3 | -1.281 |
| 3 | 5524 | 5 | 1.269 |
| 4 | 2411 | 2 | -7.730 |
| Tinian | 866 | 1 | 22.609 |
| Rota | 1261 | 1 | -12.690 |

Ideal Population: 1119 per representative

On September 22, 1983, Petitioners filed this action, under the jurisdiction granted this Court by Article II, section 4(b) of the CNMI Constitution, setting forth two principal contentions. First, Petitioners argue that the legislature failed to act within the requisite 120 days, and therefore, P.L. 3-78 is void and without force and effect. Second, citing excessive deviations among the districts, Petitioners challenge P.L. 3-78 as violative of constitutional guarantees of equal protection. In fact, Petitioners argue, any system other than at-large elections for Saipan would produce unacceptably high deviations. Petitioners seek injunctive relief enjoining any elections under P.L. 3-78 and request this Court to order all future elections for the Saipan members to be held at large.

On September 27, 1983, Respondent filed its opposition asserting that P.L. 3-78 was enacted within the constitu-

tionally established time limits and further contending that the deviations created therein are sufficiently minor and are supported by considerations of sound legislative policy.

Trial was had before this panel on September 28 and 29, 1983. On September 30, 1983, we issued our order dismissing the Petition.

Elections are scheduled for November 6, 1983.

## II. JURISDICTION

Petitioners invoke jurisdiction under Art. II, section 4 of the Constitution of the Northern Mariana Islands. Section 4(b) provides in relevant part:

> Upon the petition of any person qualified to vote, the Commonwealth appeals court or the United States District Court if no Commonwealth appeals court has been created under section 3 of Article IV has original and exclusive jurisdiction to review a plan and to amend it to comply with the requirements of this Constitution or to establish a plan if the governor has failed to act within the time provided.

Pursuant to Article II, Section 4(b), and Section 402(c) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands, the District Court sat as an appellate court, and the case was heard by a three-judge panel.

Petitioners allege that the legislature had no authority to act in that the 120-day period had already passed at the time House Bill 315 was submitted and subsequently enacted as P.L. 3-78.

747

Petitioners further contend that P.L. 3-78 violates the "one person, one vote" rule of the Equal Protection Clause of the Constitution of the Northern Mariana Islands.[11]

The cause is properly presented to this panel under the jurisdiction granted this Court by the CNMI Constitution.

Petitioners request the Court to declare P.L. 3-78 unconstitutional and to decree, in lieu thereof, a reapportionment and/or redistricting plan such that the forthcoming election be conducted on an at-large basis.

---

[11] There was some initial confusion over jurisdiction in that the petition alleges a violation of the "one person, one vote" rule of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. A suit brought to challenge the federal constitutionality of a reapportionment scheme is properly brought before a district court panel of three judges pursuant to 28 U.S.C. § 2284 The question arises whether 28 U.S.C. § 2284 applies in the Commonwealth of the Northern Mariana Islands in light of the recent Guam District Court decision in Ramsey v. Guam Election Commission, et al., (D.Guam) (July 30, 1982) Case No. 82-0185. Prior to trial, Petitioners agreed that either the petition had been filed in the wrong court, or that the correct allegation was a violation of the Equal Protection Clause of the Northern Mariana Islands Constitution. Petitioners orally, and by stipulation, amended their petition to allege a violation of the Equal Protection Clause of the Constitution of the Northern Mariana Islands. This is more technical than substantive in that the requirements of equal protection under both constitutions are identical; See footnote 12, infra. However, the procedural requirements of challenging a reapportionment plan are precisely spelled out in both cases, neither of which provide for dual pleading.

### III. ANALYSIS

#### A. The 120-Day Rule

We turn first to Petitioners' allegation that P.L. 3-78 is void and without force or effect in that it was not properly enacted pursuant to Article II, section 4 of the Constitution of the Northern Mariana Islands. (See note 5, supra)

Petitioners contend that the Bureau of Census publication dated November 1982 contained information sufficiently detailed to support a redistricting and reapportionment scheme. Accordingly then, the 120 days commenced to run as of November 1982. We find petitioners' argument without merit and hold that the legislature acted well within the 120-day period in enacting P.L. 3-78.

The districting scheme provided by P.L. 3-78 creates four election districts, comprised of municipal districts, which in turn are comprised of census enumeration districts. While the election district boundaries generally adhere to municipal district lines, in one instance, it was necessary to split one municipal district between two election districts. This was done on the basis of the population of the census enumeration districts. On this fact alone, it is clear that it was necessary to know the population of each census enumeration district in order to properly place the election district boundaries.

Petitioners make the argument that since each municipal district is composed of two or more census enumeration districts, once the population of each municipal district is known, since it necessarily contains the population of each census enumeration

district within that municipal district, then the population of each census enumeration district must also be known. This is ludicrous.

As can be seen from Section 11 of the Schedule on Transitional Matters, election districts utilized enumeration district population figures. If redistricting became necessary due to shifts in population, the enumeration district figures could become highly essential in redrawing election districts.

While the census enumeration district populations may have been segregated and recorded somewhere in the depths of a computer memory, the information was not available to humans until reduced to some readable form. The Bureau of Census publication dated November, 1982 contained only the total population of Saipan, and the populations of each municipal district. It was not until June 20, 1983 that the legislature received any information at all regarding the individual census enumeration districts, and, then, it came in the form of a computer printout, rather than an official census publication. It is thus clear that June 20, 1983 was the earliest the legislature could be held to have received the results of a decennial census.

While it is true that the Constitution refers to the publication of the census as being the date from which the 120 days commenced, we hold that "publication" occurs when an official counting of the people, showing the population figures broken down into usable data (census enumeration districts here), have been officially released to the public, or

been made available for the use of the general assembly.  <u>Cahill</u>
<u>v. Leopold</u>, 103 A.2d 818 (Conn. 1954).

We therefore hold that the 120-day period commenced at
the earliest on June 20, 1983, and that P.L. 3-78, signed into
law on September 22, 1983 was enacted well within this period.
We need not then reach the issue of Petitioners' contention whether
the additional 120-day period provided by section 4(b), within
which the governor must act, expired prior to September 22, 1983.

### B.  Case Law

We now address the constitutionality of the redistricting
and reapportionment plan provided in P.L. 3-78.  Petitioners
allege that the plan violates the "one person, one vote" rule of
the Equal Protection Clause of the Constitution of the Northern
Mariana Islands.  The equal protection clause is to be given the
same meaning and interpretation as the Equal Protection Clause of
the Fourteenth Amendment to the United States Constitution.[12]/
We therefore look to the decisions of the U.S. Supreme Court
interpreting the Equal Protection Clause of the Fourteenth
Amendment for our authority.

- - - - - - - - - -

[12]/The Due Process Clause of the Fourteenth Amendment to the
United States Constitution is also made applicable to the
Commonwealth by Section 501 of the Covenant to Establish a
Commonwealth of the Northern Mariana Islands in Political
Union with the United States of America, however, we do not
address that issue here for the reasons stated in footnote 11.
Instead, we rely on the Analysis which states:

No substantive change from section 1 of the
Fourteenth Amendment or the interpretation
of that section by the United States Supreme
Court is intended.

754

A fundamental command of equal protection is that each person's vote be given equal weight in the election of representatives, i.e., "one person, one vote." This of course requires that election districts be of nearly equal population, such that no person's vote is diluted in weight. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

While this is well settled law, there is substantial confusion over what is an acceptable deviation from absolute equality, such as will still satisfy the principle of equal population. The confusion results from the fact that there are two constitutional provisions requiring application of the "one person, one vote" rule. While the rule under the two provisions is the same, the standard applied to determine whether the rule has been violated differs. The reasons offered by the Supreme Court in support of the dual standard are often unclear, and the Court adds to the resulting confusion by maintaining the dichotomy, but using language from the two lines of cases interchangeably.

Moreover, the Court has consistently held that the determination can only be made on a case by case basis, and it has provided us with no solid rules or guidelines beyond "one person, one vote." Rather, it has presented a variety of legal standards, and left us to supply an appropriate definition, as provided by the facts in each case. For these reasons, we find it necessary to review the case law under both lines of cases, though we are concerned here only with the equal protection issue.

Article I, section 2 of the United States Constitution specifically requires that members of the House of Representatives of the U.S. Congress be chosen "by the People of the several states." In Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court probed the history of this language and concluded that, while absolute mathematical precision in drawing congressional districts was not necessary, "one person, one vote" required that the districts be drawn so as to result "as nearly as practicable" in equal representation for equal numbers of people. 84 S.Ct. at 530, 535.

In 1964, the Supreme Court also decided Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, a suit which challenged the validity of three apportionment plans for the Alabama state legislature. Petitioners charged that the apportionment plans violated the Equal Protection Clause of the Fourteenth Amendment in creating variances from equal population in ratios ranging between 5 to 1 and 59 to 1.

The Court quoted large portions of Wesberry in concluding that equal protection required equal representation for equal numbers of people, 377 U.S. at 565. However, in determining whether this "equal population" principle had been satisfied, the Court applied the traditional test under equal protection, namely, whether the State's legislative apportionment scheme constituted an invidious discrimination, or whether the alleged discrimination was rationally related to a legitimate state interest.

///

These two cases mark the beginning of the dichotomy between determinations of congressional and state legislative reapportionment plans. While both may be shown to have violated the Equal Protection Clause, the language of Article I, Section 2 is interpreted to require that congressional representation must be based on population "as nearly as practicable." The Reynolds court recognized the distinction and noted that when apportioning state legislative seats, states may seek to protect legitimate interests, and may thereby justify a deviation from the strict "equal population" principle. 377 U.S. at 537.

The Court found that, since there usually are larger numbers of seats in state legislative bodies to be distributed within a state than congressional seats, a state may be allowed some flexibility in using political subdivision lines in establishing state legislative districts without running afoul of the "one person, one vote" principle. 377 U.S. at 577.

The Court pointed out that mathematical exactness or precision is "hardly a workable constitutional requirement" and, therefore, so long as the apportionment scheme is "based substantially on population and the equal population principle [is] not diluted in any significant way," a state legislative apportionment plan which deviates from the ideal of "one person, one vote" may be constitutionally permissible. 377 U.S. at 578.

The specific rules of law laid down by the Reynolds court, however, reflect a much stricter interpretation of the "one person, one vote" rule than the more flexible policy statements

757

set forth above. In fact, the Court comes very close to holding that any variance from "one person, one vote", in and of itself, constitutes invidious discrimination:

> Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, or economic status. 377 U.S. at 566.

However, the Court goes on to qualify this statement by holding that:

> ... an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted... 377 U.S. at 568 [emphasis added]

This, the Court explained:

> ... requires that a State make an honest and good faith effort to construct districts... as nearly of equal population as is practicable. 377 U.S. at 568.

What we can glean from these two decisions is that the "one person, one vote" rule of Article I, Section 2 demands that U.S. congressional districts be apportioned to achieve precise population equality "as nearly as is practicable"; equal protection on the other hand requires only that the apportionment of state legislative districts be as near to population equality as a good faith effort allows, so long as no person's vote is substantially diluted in weight. However, the Court gives us no real indication as to what it means by "as nearly as practicable," or "in a substantial fashion."

In the 1969 case of Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the Supreme Court defined the "as nearly as practicable" standard of Art. I, Section 2, as set forth in Wesberry, to mean only that the State "make a good-faith effort [emphasis added] to achieve precise mathematical equality." 89 S.Ct., at 1229, citing Reynolds v. Sims, 377 U.S. 533, supra. In the absence of such an effort, each variance, no matter how small, must be justified.

This language appeared to temper the Wesberry "as nearly as practicable" test, and provide some flexibility to Art. I, Section 2 congressional redistricting plans by implying that good faith variances would be acceptable. The Court, however, then proceeded to strike down the plan though the maximum variance ratio was only 3.13%.

The Court first found that the population variances were not unavoidable. It emphasized that there was no fixed numerical or percentage population variance small enough to be considered de minimis and to satisfy without question the "as nearly as practicable" standard. The Court stressed that the "whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard for the circumstances of each particular case." 394 U.S. at 530, 531.

The State then offered several justifications for the variances, including an attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing

759

political subdivision boundaries. The Court rejected all the offered justifications, saying:

> Neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. 394 U.S., at 532.

The Kirkpatrick case, while elaborating on the principles set forth in Wesberry and Reynolds, did little to clear up the confusion surrounding application of the two standards. In each case the statutes were struck down as resulting in constitutionally unacceptable variances.

However, three cases decided in the 1970's provided some definite numerical guidelines to follow. All three cases involved challenges to the constitutionality, under the Equal Protection Clause, of state legislative reapportionment schemes. The variances ranged from 1.8% to 19.3%, and the Court in each case applied the tests set forth in both Reynolds and Kirkpatrick. Collectively, these cases provide support for the proposition that, at least in state legislative reapportionment schemes, variances up to 10% will be considered de minimis.

In Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), the Court upheld the plan, though the maximum variance was 7.83%, and held that an otherwise acceptable apportionment plan was not constitutionally invalid merely because its purpose was to provide districts that would achieve "political fairness" between political parties. 412 U.S. at 752.

The Court held that the population deviations among the districts failed in size and quality to amount to an invidious discrimination which would entitle petitioners to relief. The Court noted it was now time "to recognize... that minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination... so as to require justification by the State." 412 U.S. at 743, 744.

In so holding, the Court expressly denied the prior emphasis on strict population equality, saying:

> ... it is apparent that [fair and effective] representation does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. 412 U.S. at 749 [Citations omitted]

In White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court overturned a state legislative reapportionment plan which resulted in a maximum deviation from population equality of 9.9%. However, it specifically denied that the 9.9% deviation made out a prima facie equal protection violation under the Fourteenth Amendment. Rather, the Court based its holding on a showing tht the plan resulted in racial discrimination by effectively excluding the black community from participation in the Democratic primary election. The two showings, together, were enough to constitute a violation of due process.
///

A careful reading of these two cases will reveal that, though the Court strongly implies such a rule, never does it expressly hold that in state legislative reapportionment schemes variation of less than 10% will be considered to be of prima facie constitutional validity. The Court in Gaffney merely said that a showing of maximum deviations of about 8% "failed to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment." 412 U.S. at 741. In White, the Court found only that a mere showing of a 9.9% maximum deviation, without more, was not sufficient to make out a prima-facie case of invidious discrimination. 412 U.S. at 763, 764.

Nonetheless, in the 1977 case of Connor v. Finch, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465, the Supreme Court cited both Gaffney and White in support of a rule that variations under 10% will be considered de minimis, and will not require justification by the State:

> "The maximum population deviation
> of... 19.3% in the House districts
> can hardly be characterized as de
> minimis; [it] substantially exceed[s]
> the 'under 10%' deviations the Court
> has previously considered to be of
> prima facie constitutional validity..."
> 431 U.S., at 418.

///

///

///

///

///

The Court has adhered to the notion that deviations under 10% are de minimis, and in the recent case of Brown v. Thomson, ___ U.S. ____ (51 L.S. Law Week 4883)(June 22, 1983), it upheld a state legislative reapportionment plan with an average variance of 16% and a maximum variance of 89%.[13] The Court held, that as a general matter:

> a [state legislative] apportionment
> plan with a maximum population de-
> viation under 10% falls into this
> category of minor deviations. [Cita-
> tions omitted]. A plan with larger
> disparities in population, however,
> creates a prima facie case of dis-
> crimination and therefore must be
> justified by the State. [Citations
> omitted]. 51 L.Week, at 4485.

The Supreme Court has addressed the reapportionment issue on numerous occasions over the past twenty years, yet it has consistently failed to develop specific criteria which would provide lower courts with definite standards by which to analyze reapportionment cases. At best, it has set forth an array of legal standards and an abundance of possible justifications, and left the lower courts to apply them to their own facts and circumstances. With this in mind, we now turn to the facts of this case.

- - - - - - - - - -

[13] Petitioners rely to some extent on the case of Karcher v. Daggett, ___ U.S. ____ (51 U.S. Law Week 485)(June 22, 1983) decided the same day as Brown v. Thomson, which struck down a congressional reapportionment plan with a maximum variance from equal population of 0.6984%. Their reliance is misplaced, however, in that the Karcher case was brought to challenge the constitutionality, under Art. I, section 2, of a U.S. congressional district reapportionment scheme. While much of the language in the two cases is identical, this is typical of reapportionment cases, and should not be used to further confuse the two standards. We believe the the rules set forth in Connor v. Finch, supra and Brown v. Thomson, supra, are sufficient to distinguish the two lines of cases.

C.  The Present Case

Petitioners challenge P.L. 3-78 on the basis that it violates the "one person, one vote" rule of the Equal Protection Clause.  Petitioners' contentions are easily reduced to one proposition: an at-large election system for Saipan would produce the constitutionally mandated lowest deviation; therefore, any other system necessarily violates guarantees of equal protection.

Petitioners' argument is simplistic and neglects to consider the basic realities of the election process.  Historically, at-large elections were developed specifically to sacrifice minority interests in the promotion of "good government" and were heralded as progressive reform.[14]  However, these same characteristics have recently attracted criticism because of the inherent potential for the dilution of minority voting power.[15]  The Supreme Court, too, has acknowledged these charges.  In Colegrove v. Green, 328 U.S. 549, 60 S.Ct. 1198, 90 L.Ed. 1432 (1946), the Court acknowledged the dangers of striking down an improperly drawn district plan to leave at-large voting to fill the vacuum:

_ _ _ _ _ _ _ _ _

[14]Annotation, Diluting Effect of Minorities Votes by Adoption of Particular Election Plan, or Gerrymandering of Election District, as Violation of Equal Protection Clause of Federal Constitution. 27 ALR Fed. 29 , 66 (1976).

[15]See, e.g., Note, The Constitutional Significance of the Discriminatory Effects of At-Large Elections, 91 Yale Law Journal 974 (1982); Recent Cases, Multi-Member Districting of County Governing Bodies May Work Unconstitutional Dilution of Minority Voting Strength, 87 Harvard Law Review 1851 (1974); 27 ALR Fed. 29, supra, n.1.

> The result would be to leave
> Illinois undistricted and to
> bring into operation the choice
> of members for the House of
> Representatives on a state-wide
> ticket. The last stage may be
> worse than the first. The up-
> shot of judicial action may
> defeat the vital political
> principle which led Congress,
> more than a hundred years ago,
> to require districting. This
> requirement, in the language of
> Chancellor Kent, "was recommended
> by the wisdom and justice of
> giving, as far as possible, to
> the local subdivisions of the
> people of each state, a due
> influence in the choice of repre-
> sentatives, so as not to leave
> the aggregate minority of the
> people in a state, though approach-
> ing perhaps to a majority, to be
> wholly overpowered by the combined
> action of the numerical majority,
> without any voice whatever in the
> national councils." 1 Kent,
> Commentaries (12th ed., 1873)
> *230-31, n.(c).

328 U.S. at 533.

Last year, the Court in <u>Rogers v. Herman Lodge</u>, ___ U.S. ___, 102 S.Ct. 3272, 73, L.Ed.2d 1012 (1982) found unconstitutional a county-wide at-large election system because of its discriminatory effect on the large black population. Of such voting systems, the Court said:

> At-large voting schemes... tend to
> minimize the voting strength of
> minority groups by permitting the
> political majority to elect <u>all</u>
> representatives of the district.
> A distinct minority, whether it be
> a racial, ethnic, economic, or
> political group, may be unable to
> elect any representatives in an

> at-large election, yet may be
> able to elect several representa-
> tives if the political unit is
> divided into single-member districts.
> [Emphasis in original.]

102 S.Ct. at 3275.

The same aversion to at-large election systems has prompted many of the trial courts addressing the issue to refuse to impose at-large elections where the district plan is found inadequate. See e.g., Thigpen v. Meyers, (W.D. Wash., N.D. 1964) 231 F.Supp. 938, 940, aff'd. 378 U.S. 554, 84 S.Ct. 1905, 12 L.Ed.2d 1024 (1964) ("[e]lection at large would undoubtedly satisfy the constitutional requirements... however, ... such remedy might very well produce a result far more inimical than the evils sought to be eradicated in that a legislature elected on a statewide basis might very well produce a less representative government than now exists"); Skolnick v. Illinois (N.D. Ill., E.D. 1969) 307 F.Supp. 691, 696 ("[a]lthough an election at-large of a legislative body achieves exact equality of voting power for every voter, it usually tends to reduce the effectiveness of his vote. It is an undesirable remedy for the problem of dispropor-tionate districts...").

Petitioners' proposal at best amounts to what respondent aptly termed a "non-plan." The people of the Northern Mariana Islands have chosen, through their ratification of the Constitu-tion, a district system of representation. House Speaker Fitial, a member of the Constitutional Convention, testified that there was a general agreement that representatives should be elected

766

from districts, as opposed to at-large, (which was the system used in pre-Commonwealth elections) to insure their accountability to the voters, to protect the interests of the minority Carolinian population and to provide for representation of regional interests. In addition, in its debates on P.L. 3-78, the Third CNMI Legislature again considered the at-large option for Saipan and rejected it based on the same considerations.[16]

The people of the NMI have considered the issue of election systems and have chosen a district system of representation. Their choice demonstrates an understanding of the intricacies of election mechanics. We refuse to deprive the people of their chosen system and place in its stead an at-large system which they expressly rejected and which has come into disrepute of late due to its glaring pitfalls.

Petitioners have produced no evidence of invidious discrimination in the design of P.L. 3-78 nor any evidence of bad faith in its creation.

Petitioners have shown only that P.L. 3-78 results in variances from equal population among the districts. The average variance from equal population is 7.79%, and the maximum variance of 22.61% which includes Rota and Tinian admittedly is well above

- - - - - - - - -

[16] Petitioners' Exhibit 4, Standing Committee Report No. 3-158. Petitioners' contention that an at-large plan actually intensifies the voting strength of the Carolinians is preposterous and typifies the misleading arguments relied upon by petitioners throughout the course of this litigation. First, petitioners present no evidence to substantiate their bald assertions that P.L. 3-78 dilutes Carolinian voting power. Second, to argue that an at-large system will adequately protect the interests of the Carolinians, who, by petitioners' own testimony, constitute only one-third of the population, flys in the face of logic and experience.

the 10% maximum deviation generally considered to be de minimis. We must, therefore, examine the particular facts and circumstances surrounding the plan to determine whether there exist acceptable reasons for the variations among the populations of the various districts. Kirkpatrick v. Preisler, 394 U.S. at 532, supra; Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967).

The Brown case, supra, is particularly helpful in disposing of this question in that we find many similarities between the two plans. The Wyoming plan specifically provided that the State's least populous county be given one representative, even though the statutory formula used to reapportion would have rounded its population to zero. Petitioners did not attack the constitutionality of the entire plan, but only the alleged discrimnatory effect of the single county's representative. The Wyoming plan resulted in an average deviation of 16% and a maximum deviation of 89%.

Similarly, here, Article II, Section 3 of the Constitution specifically provides that the islands of Rota and Tinian shall each elect one representative to the legislature. Thus, in any reapportionment and redistricting of Saipan, we must also consider how the plan affects the weight of the votes from these two islands. The Court in Brown specifically recognized that:

> Some deviations from population equality may be necessary to permit the States to pursue other legitimate objectives such as 'maintain[ing] the integrity of various political subidivisions' and 'provid[ing] for compact districts of

contiguous territory.' [Citations
omitted] 51 U.S. Law Week, at 4885.

The ultimate inquiry, the Court said, is whether the
legislature's plan "may reasonably be said to advance a rational
state policy and, if so, whether the population disparities among
the districts that have resulted from the pursuit of this plan
exceed constitutional limits." 51 U.S. L.Week, at 4886, citing
Mahan v. Howell, 410 U.S. 315, 93 .S.Ct. 979, 35 L.Ed.2d 320 (1973).
The Court gave these considerations particular force in
light of the "peculiar size and population [distribution] of the
State and the nature of its governmental structure," as well as
the lack of any evidence tending to show bad faith. 51 U.S.
L.Week at 4886. Finally, the Court held that:

> The consistency of application and
> the neutrality of effect of the
> non-population criteria must be
> considered along with the size of
> the population disparities in
> determining whether a state legis-
> lative apportionment plan contra-
> venes the Equal Protection Clause.
> 51 U.S. Law Week, at 4886.

The unique geographical locations, a relatively small
population of 16,780 and its distribution within the Northern
Mariana Islands impose inherent limitations on the designation of
election districts. The framers of the Constitution were aware
of these demographic factors and included in the Constitution
certain constraints which must be followed in providing for the
redistricting and reapportionment of legislative seats. See,
supra, p.4.

769

In addition to the constitutional limitations on the ability to achieve precise mathematical equality, Respondent has provided adequate justification for deviations resulting from P.L. 3-78.

Testimony and evidence shows that a strong policy of preserving "cultural traditions of the island of Saipan" was applied and considered in preserving as much as possible Saipan's political subdivisions designated as municipal districts. Traditionally, members of municipal districts work together cooperatively in planning and carrying out broad based village ventures and activities such as village fiestas in honor of village patron saints. These observances, while religious in origin, have become deeply identified as a part of their culture. It is clear that these traditional district boundaries represent more than just a random effort to draw district lines but represent a good faith effort to preserve, among other values, cultural and historical ties which unite each village.

There was also evidence that the Commonwealth is deeply committed to protecting the specific interests of the minority Carolinian population on Saipan. The Constitution of the Northern Mariana Islands specifically provides for the Office of Executive Assistant for Carolinian Affairs in the executive branch of the government. Further, Speaker Fitial, who is himself Carolinian, testified that maintaining the Carolinian population's voting strength was expressly and carefully considered in the redistricting and reapportionment determinations. Providing the minority

Carolinian population a chance for representation in the legislature promotes a worthy state interest and more than adequately justifies the small deviations resulting therefrom.

Like the _Brown_ case, this case presents an "unusually strong example of an apportionment plan the population variations of which are entirely the result of the consistent and non-discriminatory application of... legitimate state polic[ies]". 51 U.S. Law Week, at 4886. We feel each of the stated justifications bears sufficient relation to a legitimate state policy to justify the variances from equal population that exist as a result of the redistricting provided by P.L. 3-78. Taken in conjunction with the constitutionally mandated constraints (1) that the number of representatives shall not exceed twenty; (2) that the districts be compact and contiguous; and (3) the inherent limitations imposed by the separateness of islands and the distribution of population in the Commonwealth, we find the variances are well within a constitutionally permissible level.

We therefore hold, pursuant to the Decision rendered on September 30, 1983, that the enactment of Public Law 3-78 came within the time limitations prescribed by Article II, Sections 4(a) and 4(b) of the Constitution of the Northern Mariana Islands, and further, that Public Law 3-78 as enacted does not violate the equal protection requirement of "one person, one vote" principle.

///

///

///

771

-DATED this 6ᵀᴴ day of October, 1983.

JUDGE ALFRED LAURETA

JUDGE ERNEST F. GIANOTTI